UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-2(c)

**CONNELL FOLEY LLP**
Stephen V. Falanga (SF-6414)
Philip W. Allogramento III (PA-7796)
85 Livingston Avenue
Roseland, NJ 07068
Tel: (973) 535-0500
Fax: (973) 535-9217
*Proposed Counsel to Debtor and Debtor in Possession*

| | |
|---|---|
| In re: | Chapter 11 |
| G&S LIVINGSTON REALTY, INC., | Bankr. Case No.: 11- |
| Debtor. | |

**DISCLOSURE STATEMENT IN CONNECTION WITH THE
PREPETITION SOLICITATION OF VOTES IN RESPECT OF THE PREPACKAGED
PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

NO CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE HAS YET BEEN COMMENCED. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY ANY UNITED STATES BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.

THIS DISCLOSURE STATEMENT FOR THE PREPETITION SOLICITATION OF VOTES IN RESPECT OF THE PREPACKAGED PLAN OF REORGANIZATION OF THE DEBTOR, G&S LIVINGSTON REALTY, INC., THE ACCOMPANYING BALLOTS AND RELATED MATERIALS DELIVERED HEREWITH, ARE BEING PROVIDED BY THE DEBTOR TO KNOWN HOLDERS OF CLAIMS AND EQUITY INTERESTS PURSUANT TO SECTIONS 1125(g) AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE DEBTOR'S SOLICITATION OF VOTES TO ACCEPT THE PLAN.

PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY. THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PREPACKAGED PLAN OF REORGANIZATION PROPOSED BY THE DEBTOR. THE DEBTOR BELIEVES THAT THIS PLAN OF REORGANIZATION IS IN THE BEST INTEREST OF THE CREDITORS

AND THAT THE PLAN IS FAIR AND EQUITABLE. THE DEBTOR URGES THAT THE VOTER ACCEPT THE PLAN, WHICH IS ATTACHED HERETO AS EXHIBIT A.

A SUMMARY OF THE VOTING PROCESS IS SET FORTH IN SECTION IV OF THIS DISCLOSURE STATEMENT. ADDITIONAL INSTRUCTIONS ARE CONTAINED ON THE BALLOTS DISTRIBUTED TO CREDITORS ENTITLED TO VOTE ON THE PLAN (THE "BALLOTS").

TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY 5:00 P.M., EASTERN TIME, ON AUGUST 6, 2011 (THE "VOTING DEADLINE"), UNLESS EXTENDED IN WRITING BY THE DEBTOR. NOTWITHSTANDING THE VOTING DEADLINE, THE DEBTOR RESERVES THE RIGHT TO FILE A THE BANKRUPTCY CASE PRIOR TO AUGUST 6, 2011 IF ALL BALLOTS HAVE BEEN RETURNED.

IN THE EVENT THE DEBTOR DETERMINES TO COMMENCE A CHAPTER 11 CASE, THE PLAN CAN BE CONFIRMED BY THE BANKRUPTCY COURT AND THEREBY MADE BINDING UPON YOU IF IT IS ACCEPTED BY THE HOLDERS OF TWO-THIRDS IN AMOUNT AND MORE THAN ONE-HALF IN NUMBER OF CLAIMS IN EACH CLASS OF CLAIMS THAT IS ENTITLED TO VOTE THAT VOTES ON THE PLAN, OR IF THE PLAN OTHERWISE SATISFIES THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE.

THE DEBTOR HAS NOT AT THIS TIME TAKEN ANY ACTION TO COMMENCE A CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.  IF YOU VOTE IN FAVOR OF THE PLAN, YOUR VOTE ON THE PLAN CAN BE USED BY THE DEBTOR IN CONNECTION WITH A FUTURE BANKRUPTCY FILING.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF.

THE EFFECTIVENESS OF THE PROPOSED PLAN IS SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED, OR WAIVED BY THE RELEVANT PARTIES.

NO PERSON IS AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS SUBMITTED HEREWITH ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.  HOLDERS OF CLAIMS SHOULD NOT RELY ON ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN YOUR

ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT AS MAY BE EXPRESSLY INDICATED HEREIN. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR FROM NUMEROUS SOURCES AND IS BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF. HOLDERS OF CLAIMS MUST RELY ON THEIR OWN EXAMINATION OF THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. BEFORE SUBMITTING BALLOTS, HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN BUT DOES NOT CONTAIN ALL OF ITS TERMS AND PROVISIONS. ALL PARTIES WHO ARE ENTITLED TO VOTE ON THE PLAN ARE STRONGLY ADVISED TO REVIEW THE PLAN IN ITS ENTIRETY BEFORE VOTING ON THE PLAN. TO THE EXTENT OF ANY INCONSISTENCY BETWEEN THE PLAN OR ANY PLAN DOCUMENT AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE PLAN DOCUMENT ARE CONTROLLING.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE (IN CONJUNCTION WITH A REVIEW OF THE PLAN) WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY. THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY THEIR NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

2524357-09

## TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ............................................................................................................ 1
  A.                 Purpose of This Document ................................................................. 2
  B.                 Confirmation Procedures ................................................................... 3
      1.       Time and Place of the Future Court Hearings Concerning the Plan
               and Disclosure Statement .................................................................. 4
      2.       Deadline For Voting For or Against the Plan ..................................... 4
      3.       Deadline For Objecting to the Disclosure Statement and
               Confirmation of the Plan .................................................................... 5
      4.       Identity of Person to Contact for More Information  Regarding the
               Plan ................................................................................................... 5
  C.                 Disclaimer ......................................................................................... 5

II. BACKGROUND ........................................................................................................... 5
  A.                 Description and History of the Debtor's Business ................................ 6
  B.                 Principals/Affiliates of Debtor's Business .......................................... 6
  C.                 Management of the Debtor Before and During the Bankruptcy ........... 6
  D.                 The Debtor's Pre-Petition Secured Debt ............................................. 6
  E.                 Events Leading to Chapter 11 Filing .................................................. 7
      1.       The Loss of Tenants and Income ........................................................ 8
      2.       The Restructuring Support Agreement ................................................ 8
  F.                 Significant Events Leading up to the Bankruptcy ............................... 9
      1.       Anticipated Bankruptcy Proceedings ................................................. 10
      2.       Other Legal Proceedings .................................................................... 10
      3.       Actual and Projected Recovery of Preferential or Fraudulent
               Transfers ........................................................................................... 11
      4.       Procedures Implemented to Resolve Financial Problems .................... 11
      5.       Current and Historical Financial Conditions ...................................... 11

III. SUMMARY OF THE PLAN OF REORGANIZATION ............................................. 12
  A.                 Introduction To Plan ......................................................................... 12
  B.                 Unclassified Claims ........................................................................... 13
      1.       Administrative Expenses and Fees ..................................................... 13
      2.       Priority Tax Claims ............................................................................ 14
      3.       Certain Priority Non-Tax Claims ....................................................... 14
  C.                 CLASSIFIED CLAIMS AND INTERESTS ...................................... 15
      1.       Class 1. Secured Claim of Essex Ten ................................................ 15
      2.       Class 2. General Unsecured Claims .................................................... 16
      3.       Class 3. Affiliated General Unsecured Claims .................................... 16
      4.       Class 4. Equity Interest Holders ......................................................... 16
  D.                 Means Of Effectuating The Plan ........................................................ 17
      1.       Effectuating The Plan ......................................................................... 17
      2.       Post-confirmation Management ........................................................... 18
      3.       Disbursing Agent ............................................................................... 18

|  | 4. | Mechanism for Distributions to General Unsecured Claims | 18 |
|  | 5. | Disputed Claims Reserve | 19 |
|  | 6. | Exemption from Certain Transfer Taxes | 20 |
|  | 7. | CVS Litigation | 20 |
| E. |  | Other Provisions Of The Plan | 20 |
|  | 1. | Executory Contracts and Unexpired Leases | 20 |
|  | 2. | Retention of Jurisdiction | 22 |
|  | 3. | Procedures for Resolving Contested Claims | 24 |
|  | 4. | Effective Date | 25 |
|  | 5. | Modification | 27 |

**IV. CONFIRMATION REQUIREMENTS AND PROCEDURES** ............................................. 27

| A. |  | Who May Vote or Object | 28 |
|  | 1. | Who May Object to Confirmation of the Plan | 28 |
|  | 2. | Who May Vote to Accept/Reject the Plan | 28 |
|  | 3. | Who Is Not Entitled to Vote | 29 |
|  | 4. | Who Can Vote in More Than One Class | 30 |
|  | 5. | Votes Necessary to Confirm the Plan | 30 |
|  | 6. | Votes Necessary for a Class to Accept the Plan | 30 |
|  | 7. | Treatment of Nonaccepting Classes | 30 |
|  | 8. | Request for Confirmation Despite Nonacceptance by Impaired Class(es) | 31 |
| B. |  | Liquidation Analysis | 31 |
| C. |  | The Feasibility Test | 32 |

**V. EFFECT OF CONFIRMATION OF PLAN** ............................................................ 33

| A. | Discharge | 33 |
| B. | Revesting of Property in the Debtor | 34 |
| C. | Modification of Plan | 34 |
| D. | Post-Confirmation Quarterly Fees | 34 |

**VI. GENERAL PROVISIONS** .................................................................. 35

| A. | Settlement of Claims and Controversies; Releases and Injunctions | 35 |
| B. | Extensions of Time | 35 |
| C. | Closing of the Case | 36 |
| D. | Interest | 36 |
| E. | Confirmation by Non-Acceptance Method | 36 |
| F. | Severability | 36 |
| G. | Governing Law | 36 |
| H. | No Admissions or Waivers | 36 |
| I. | Successors and Assigns | 37 |
| J. | Rounding of Distribution | 37 |
| K. | Undeliverable Distributions | 37 |
| L. | Setoff and Recoupment Rights Preserved | 38 |
| M. | Payment of Statutory Fees and Filing of Quarterly Reports | 39 |
| N. | Exculpation | 39 |
| O. | Right to Revoke Plan Prior to Effective Date. | 40 |

P.        Certain U.S. Federal Income Tax Consequences of the Plan ............................... 40

    1.      U.S. Federal Income Tax Consequences to the Debtor. ........................................ 42

    2.      Federal Income Tax Consequences to Claimants .................................................. 47

VII. CONCLUSIONS AND RECOMMENDATION ................................................................. 51

## TABLE OF EXHIBITS

EXHIBIT A -- PLAN OF REORGANIZATION

EXHIBIT B -- FINANCIAL STATEMENTS

EXHIBIT C -- LIQUIDATION ANALYSIS

EXHIBIT D -- RESTRUCTURING SUPPORT AGREEMENT

2524357-09

# I.

## <u>INTRODUCTION</u>

G&S Livingston Realty, Inc., a New Jersey corporation (the "Debtor" or "Plan Proponent"), intends to file a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code" or "Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").  In connection with this anticipated bankruptcy filing, the Debtor proposes the Prepackaged Plan of Reorganization attached hereto as Exhibit A (together with its exhibits and as amended from time to time the "Plan") pursuant to Section 1121 of the Bankruptcy Code.  The Plan has been developed based upon a thorough review and analysis of the Debtor's financial condition, business model, and restructuring alternatives.  The Debtor submits this disclosure statement (the "Disclosure Statement") in connection with the solicitation of votes to accept or reject the Plan.  The following summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing in the Plan.  The Debtor urges every Claimant[1] holding a Claim in an Impaired Class to accept the Plan.

The Debtor has not yet filed for bankruptcy and the Bankruptcy Court has not yet been asked to approve of this Disclosure Statement as containing "adequate information" in accordance with Section 1125(b) of the Bankruptcy Code.  If a legally sufficient amount and number of impaired Claims vote in favor of the Plan, the Debtor intends to file a chapter 11 case and seek confirmation of the Plan as soon as practical after the earlier to occur of (i) the Voting Deadline, or (ii) the date on which all ballots have been returned.  A hearing to consider the

---

[1] Unless otherwise defined, all capitalized terms contained in this Disclosure Statement have the meanings ascribed to them in the Plan.  To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition in the Plan shall control.

1

adequacy of this Disclosure Statement and to approve of the confirmation of the Plan will be requested at such time as the Debtor files for bankruptcy.

Attached as Exhibits to this Disclosure Statement are copies of the following documents:

Exhibit A:    The Plan;

Exhibit B:    Financial Statements;

Exhibit C:    Liquidation Analysis.

Exhibit D:    Restructuring Support Agreement

## A.    Purpose of This Document

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.  The Debtor is providing this Disclosure Statement to all Creditors who are being solicited to vote to accept or reject the Plan, and to other Persons only for informational and notice purposes.  This Disclosure Statement summarizes the Plan's content and provides information relating to the Plan and the process the Bankruptcy Court will follow in determining whether to confirm the Plan.  This Disclosure Statement also describes the negotiation of the Plan, discusses the events leading to the Debtors' filing their Chapter 11 cases, and, finally, summarizes and analyzes the Plan.  This Disclosure Statement also describes certain U.S. federal income tax consequences of the Plan to the Debtors and Holders of Claims and Equity Interests, voting procedures and the confirmation process.

### READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:

**(1)    WHO CAN VOTE OR OBJECT,**

(2)    **THE PROPOSED TREATMENT OF YOUR CLAIM (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE IN LIQUIDATION,**

(3)    **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS LEADING TO THE BANKRUPTCY,**

(4)    **WHAT THE COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM THE PLAN,**

(5)    **THE EFFECT OF CONFIRMATION, AND**

(6)    **THE FEASIBILITY OF THE PLAN.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you. Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

**This Disclosure Statement is being provided to each Creditor and Equity Interest Holder known to the Debtor as of the date of this Disclosure Statement.**

**B.**    **Confirmation Procedures**

Persons Potentially Eligible to Vote on the Plan

In determining acceptance of the Plan, votes will only be counted if submitted by a Creditor whose Claim is Impaired and whose Claim is considered by the Debtor to be undisputed, non-contingent and unliquidated. **If you are eligible to vote on the Plan, you will have been sent a ballot, a return envelope and voting instructions (the "Voting Package") along with this Disclosure Statement and Plan.** The Voting Package that you received does

3

not constitute a proof of claim.  If you believe that you have not been provided with Voting Package in error, you will have an opportunity after the Debtor files its bankruptcy petition to have the Court determine whether your Claim has been properly classified by the Debtor.

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

1.    **Time and Place of the Future Court Hearings Concerning the Plan and Disclosure Statement**

Upon filing for bankruptcy, the Debtor will make a formal request of the Court  by way of Motion to obtain a Court Order: (a) scheduling a combined hearing (the "Combined Hearing") to consider approval of the adequacy of the Disclosure Statement  relating to the Debtor's Plan, confirmation of the Plan, and adequacy of the solicitation procedures (the "Solicitation Procedures") utilized in connection with the prepetition solicitation of votes to accept or reject the Plan, (b) establishing procedures for objecting to the Disclosure Statement, the Plan, and the Solicitation Procedures, (c) approving the form, manner, and sufficiency of notice of the Combined Hearing, and (d) granting related relief.  You will be provided with notice of the date established for the Court Hearing(s) to consider the aforementioned matters.

2.    **Deadline For Voting For or Against the Plan**

If you are entitled to vote, it is in your best interests to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to:

Stephen V. Falanga, Esq.
Connell Foley, LLP
85 Livingston Avenue
Roseland, New Jersey 07068

4

Your ballot must be ACTUALLY RECEIVED by the Voting Deadline or it will not be counted. The Debtor reserves the right to close the voting process if all creditors entitled to vote on the Plan return their ballots prior to the aforementioned voting deadline.

### 3. Deadline For Objecting to the Disclosure Statement and Confirmation of the Plan

Objections to the disclosure statement and confirmation of the Plan must be filed with the Court and served upon counsel for the Debtor, Stephen V. Falanga, Esq., Connell Foley LLP, 85 Livingston Avenue, Roseland, N.J. 07068 so as to be ACTUALLY RECEIVED by no later than seven (7) days prior to the date set by the Court for the Combined Hearing. You will be provided with notice of this hearing date

### 4. Identity of Person to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact counsel for the Debtor at the following address:

Stephen V. Falanga, Esq.
Connell Foley LLP
85 Livingston Avenue
Roseland, N.J. 07068,
Telephone 973-535-0500

## C. Disclaimer

The financial data relied upon in formulating the Plan is based on the Debtor's books and records. The information contained in this Disclosure Statement is provided by G&S Investors, Inc., the Debtor's property management company, and Koshers & Company, the Debtor's accountants. The Debtor represents that everything stated in the Disclosure Statement is true to the Debtor's best knowledge.

## II.

## <u>BACKGROUND</u>

## A.    Description and History of the Debtor's Business

Established in 1993, the Debtor is a for-profit corporation organized and existing under the laws of the State of New Jersey.  The Debtor owns of all of the land, fixtures and improvements of the Daven Avenue Shopping Center located along Route 10 in Livingston, New Jersey (the "Livingston Property").  The Livingston Property presently has two buildings, a 79,138 sq. ft. retail building and a 42,500 sq. ft. retail building, that are divided into four separate rental units.  The Debtor's primary source of income is rent derived from leasing the Livingston Property to commercial tenants.

## B.    Principals/Affiliates of Debtor's Business

a.    Gregg Wasser; owner of forty percent of the Debtor's stock.

b.    Lawrence Traub; owner of thirty-five percent of the Debtor's stock.

c.    Dr. Harris Wasser; owner of twenty-five percent of the Debtor's stock.

## C.    Management of the Debtor Before and During the Bankruptcy

The following is a list of the management of the Debtor at the time of the bankruptcy filing.

a.    Gregg Wasser; President, Treasurer and Director.

b.    Douglas N. Riley; Director/Secretary.

c.    Dr. Harris Wasser; Director.

The Debtor anticipates that its management structure will remain unchanged for the duration of its Chapter 11 Case.

## D.    The Debtor's Pre-Petition Secured Debt

The Livingston Property is encumbered by a mortgage securing a promissory note and loan agreement dated July 14, 2005 in the principal amount of $28,125,000.00, plus any accrued

interest, penalties and fees, which was initially made between the Debtor and Barclays Capital Real Estate, Inc. and was subsequently securitized and sold to the registered holder of Banc of America Commercial Mortgage, Inc., Commercial Mortgage Pass-Through Series Certificates Series 2005-5 (the "Existing Loan").  The Existing Loan is further secured by a security interest granted by the Debtor in substantially all of the Debtor's personal property related to the Livingston Property, including, *inter alia*: all rents, rights to legal actions, insurance proceeds, accounts and other intangibles (the "Personal Property")[2].  The Existing Loan is a non-recourse loan that may become recourse under certain circumstances as defined in Section 12 of the loan agreement.  The current owner of the Existing Loan has agreed to waive all conditions contained in the loan documents that would prohibit the commencement of this bankruptcy proceeding and has further agreed to allow for the Debtor to transfer the Livingston Property to Daven Avenue under the terms of a Restructuring Support Agreement (the "RSA" -- discussed below).   In addition, there was a guarantee executed in connection with the loan, pursuant to which Gregg Wasser guaranteed obligations of the Existing Loan subject to the limitations contained in Section 12 of the loan agreement.

Pursuant to a loan sale agreement dated February 3, 2011, Essex Ten Financial, LLC, a New Jersey limited liability company, that is a wholly owned subsidiary of KABR, purchased the Existing Loan.  As of the Petition Date, the principal amount of indebtedness under the Existing Loan was $28,125,000, which amount may be subject to dispute, objection, setoff or other defenses.

**E.**     **Events Leading to Chapter 11 Filing**

---

[2] Essex Ten's security interest does not apply to the shareholder loan reflected in Exhibits B and C to this Disclosure Statement and, accordingly, this shareholder loan is not included in the definition of "Personal Property".

1.      **The Loss of Tenants and Income** -- Over the last four years, the Debtor experienced a substantial decline in its primary source of income as two of the four tenants of the Livingston Property, Circuit City and Linens 'N Things, filed for bankruptcy and rejected their leases with the Debtor.  After the departure of these two tenants, the remaining two tenants, Old Navy and Borders, exercised their co-tenancy rights under their respective leases to vacate the Livingston Property.  Despite its best efforts, the Debtor was not able to re-lease the spaces left vacant by the four departing tenants.

The Debtor's last source of regular income, which was based upon payments made by CVS Pharmacy, Inc. ("CVS") as the present guarantor for the rental obligations of one of the bankrupt former tenants, Linens 'N Things (the "Guaranty"), ceased in 2009 upon the refusal of CVS to continue making payments under the Guaranty.  The Debtor has initiated litigation against CVS to enforce the Guaranty (the "CVS Claim") that is presently pending in the United States District Court for the District of New Jersey and in connection with that litigation CVS has asserted a counterclaim against the Debtor seeking the return of certain payments CVS has already made pursuant to the Guaranty.

2.      **The Restructuring Support Agreement** -- Faced with the loss of income necessary to continue paying the Existing Loan and maintaining the Livingston Property, and yet possessing a desire to attract new capital to renovate the Livingston Property to attract new tenants, entered into negotiations with KABR.  As a result of these negotiations, KABR has agreed to assist the Debtor's reorganization goal by, inter alia, acquiring the Existing Loan, providing a portion of the new capital necessary to allow for the continued maintenance of the Livingston Property and committing to help secure new financing that will enable the Livingston Property to be transformed into a revitalized and successful commercial venture of which the

8

Debtor and KABR will each be part owners through a newly-formed entity.  In furtherance of this agreement and prior to this bankruptcy filing, KABR and the Debtor entered into the RSA that serves to both: a) pave the way for the Debtor to file for bankruptcy and propose this Plan and b) provide the necessary foundation for the series of transactions that will direct the Debtor's proposed restructuring and eventual exit from bankruptcy.  In furtherance of the transactions contemplated under the RSA, Essex Ten has purchased the Existing Loan and waived any restrictions contained therein that would have prevented the Debtor from bringing this Chapter 11 Case.  The RSA is an integral part of the Plan and will be assumed by the Debtor in connection with confirmation of the Plan.  The RSA is attached to this Disclosure Statement as Exhibit D.

Under the terms of the RSA (and its exhibits as incorporated therein), Joseph Lobuono, an individual who provided advice and consulting services to the Debtor and KABR in connection with the development of the RSA, will be a become a member of Daven Avenue through the granting of a five percent residual ownership interest in such entity at the time the Amended and Restated Operating Agreement is executed.  Such residual five percent interest is entitled to a pro rata distribution after KABR and the Debtor receive a return of the value of the total amount of cash contributed to Daven Avenue and agreed upon net fair market value amount of any property contributed to Daven Avenue, but not including the Livingston Property or the CVS Claim, less any distribution ("Unrecovered Capital") plus an eight percent return on such Unrecovered Capital as determined from time to time.  Additionally, Rapad Management, LLC, a New Jersey limited liability company and affiliate of KABR, will be entitled to a consulting fee from Daven Avenue on a per annum basis of one percent of Daven Avenue's gross revenues.

**F.     Significant Events Leading up to the Bankruptcy**

9

### 1.    Anticipated Bankruptcy Proceedings

The Debtor anticipates filing a chapter 11 bankruptcy petition in the District of New Jersey Bankruptcy Court shortly after the earlier of the Voting Deadline or the date on which all Ballots have been returned.  On the petition date, the Debtor anticipates filing a number of motions that will include: (i) a Motion to Retain Connell Foley, LLP as Bankruptcy Counsel for the Debtor, (ii) a Motion to Retain and Compensate Ordinary Course Professionals, (iii) a Motion Authorizing the Continued Maintenance of Existing Corporate Bank Accounts, (iv) a Motion to prohibiting Utility Companies from discontinuing, altering or refusing service to the Debtor and (v) a Motion to scheduling a Combined Hearing to consider approval of the adequacy of the Disclosure Statement, the Plan and granting related relief.

### 2.    Other Legal Proceedings

The CVS Claim -- As briefly mentioned supra, the Debtor is currently involved in legal proceeding that arose pre-petition with CVS, the guarantor of the rent obligation of one of the bankrupt former tenants, Linens 'N Things.  The Debtor, by way of complaint filed in the United States Court for the District of New Jersey, is seeking, inter alia, to recover the payment of all remaining amounts due under the Guaranty from CVS that total approximately $10,838,000.00 over the remainder of the underlying lease term.  CVS has asserted a counterclaim against the Debtor seeking, inter alia, to void the Guaranty and seeking reimbursement of the $807,500.04 paid pursuant to the Guaranty to date.  This case has progressed through discovery and the CVS counterclaim is presently stayed due the imposition of the automatic stay triggered with the filing of the Debtor's bankruptcy case.  The Debtor does not expect this litigation to have any significant impact upon the Debtor's ability to confirm the Plan as the Plan will provide for the payment in full of any claim CVS may recover against the Debtor on account of its counterclaim.

Land Use Application -- In connection with the Debtor's ultimate goal of remaking the Livingston Property to attract new tenants, on May 27, 2010, an application for preliminary and final site plan approval with variances was made to the Township of Livingston Planning Board for the Livingston Property.  The proposed project consists of: (i) a 7,150 sq. ft. expansion to an existing 79,138 sq. ft. retail building, (ii) a 17,250 sq. ft. expansion to an existing 42,500 sq. ft. retail building, and (iii) associated alterations to parking areas.  After the completion of the proposed additions, the two buildings will measure 86,288 sq, ft., and 59,750 sq. ft., respectively. On April 5, 2011, the Livingston Planning Board granted the Debtor's application for preliminary and final site plan approval with variances.

### 3.　　Actual and Projected Recovery of Preferential or Fraudulent Transfers

Given that the Plan as proposed anticipates full payment to all Allowed Unaffiliated General Unsecured Claims, no preferential transfer actions will be pursued in connection with the Plan.

### 4.　　Procedures Implemented to Resolve Financial Problems

Since the loss of tenants at the Livingston Property began, the Debtor has actively worked to re-lease its vacant commercial space at the Livingston Property and reduce any unnecessary overhead.   These procedures, however, could not by themselves remedy the Debtor's financial problems resulting from the continued loss of tenancies.  As discussed above, in order to resolve the Debtor's financial problems and retool the Livingston Property to attract a new tenant mix along the Route 10 corridor, the Debtor reached agreement with KABR to enter into the RSA that paves the way for the Debtor's reorganization.

### 5.　　Current and Historical Financial Conditions

The Debtor is currently operating without a regular source of income due to the inability to find new tenants to lease commercial space at the Livingston Property.  Pursuant to the RSA, new capital will be contributed by the Debtor's Equity Interest Holders and members for KABR that will allow for the transformation of the Livingston Property and payment in full of the Claims of the Debtor's unaffiliated creditors.

The Debtor maintains audited financial statements prepared in conformity with generally accepted accounting principals.  A summary of the Debtor's current and historical financial conditions is reflected in the financial statements attached hereto as <u>Exhibit B</u>.

### III.

### <u>SUMMARY OF THE PLAN OF REORGANIZATION</u>

**A.    Introduction To Plan**

This Disclosure Statement contains a summary of the Plan and is qualified in its entirety by the full text of the Plan itself.  All terms defined in the Plan have the same meaning in this Disclosure Statement.  The definitions do not appear in the summary set forth below (See Section II of the Plan for the definitions).

The Plan, if confirmed, will bind the Debtor, any entity acquiring property under the Plan or otherwise transferring property pursuant to the Plan, and all Claimants in the Debtor's Chapter 11 Case.  The Plan is intended to deal with all Claims against the Debtor of whatever character, whether or not contingent or unliquidated and whether or not allowed by the Bankruptcy Court pursuant to Section 502 of the Bankruptcy Code.  All Claimants and other interested Parties are urged to read the Plan and all of its Exhibits carefully.

The Plan designates four Classes of Claims and also identifies certain Claims, such as Administrative Claims, which are not Classified and are excluded from the four Classes of

Claims.  A Claim is classified in a particular class only to the extent that the Claim qualifies within the description of that Class.  A Claim is only in a particular Class to the extent that the Claim is an Allowed Claim in that Class.

**B.      Unclassified Claims**

Certain types of Claims are not placed into voting classes.  They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Debtor has not placed the following Claims in a class:

**1.      Administrative Expenses and Fees**

Administrative expenses are Claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Code Section 503(b).  Fees payable to the Clerk of the Bankruptcy Court and the Office of the United States Trustee will also be incurred during the Chapter 11 Case.  All administrative expenses will be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

Court Approval of Professional Claims Required:

Pursuant to the Bankruptcy Code, the Court must approve all Professional Claims.  The professional in question must file and serve a properly noticed fee application for compensation and reimbursement of expenses and the Court must rule on the application.  Only the amount of compensation and reimbursement of expenses allowed by the Court will be owed and required to be paid under this Plan as an administrative Claim.

Each professional person who asserts a further administrative Claim that accrues before the confirmation date shall file with the Bankruptcy Court, and serve on all parties required to receive notice, an application for compensation and reimbursement of expenses no later than ninety (90) days after the Effective Date of the Plan.  Failure to file such an application timely

13

shall result in the professional person's Claim being forever barred and discharged.  Each and

every other person asserting an administrative Claim shall be entitled to file a motion for

allowance of the asserted administrative Claim within ninety days of the Effective Date of the

Plan, or such administrative claim shall be deemed forever barred and discharged.  No motion or

application is required to fix the fees payable to the Clerk's Office or Office of the United States

Trustee.  Such fees are determined by statute.

### 2.        Priority Tax Claims

The Debtor does not believe that there are any holders of Priority Tax Claims.  All

requests for payment of Claims by a Governmental Unit (as defined in section 101(27) of the

Bankruptcy Code) for Taxes for any tax year or period, all or any portion of which occurs or falls

within the period from and including the Petition Date through and including the Effective Date,

and for which no Bar Date has otherwise been previously established, must be Filed on or before

the later of: (a) sixty (60) days following the Effective Date; or (b) to the extent applicable,

ninety (90) days following the filing of a tax return for such Taxes (if such Taxes are assessed

based on a tax return) for such tax year or period with the applicable Governmental Unit. Any

holder of a Claim for Taxes that is required to file a request for payment of such Taxes and other

amounts due related to such Taxes and which does not file such a Claim by the applicable bar

date shall be forever barred from asserting any such Claim against the Debtor, its Estate, or any

other entity, or their respective property and shall receive no distribution under the Plan or

otherwise on account of such Claim.  Priority Tax Claims that are Allowed will be paid in full on

the Effective Date of the Plan or, alternatively, on the Effective Date, the Debtor may agree to

pay any Holder of such Allowed Priority Tax Claim the present value of such Claim in deferred

cash payments, over a period not exceeding six years from the date of the assessment of such tax.

### 3.        Certain Priority Non-Tax Claims

14

Certain priority non-tax Claims that are referred to in Code Sections 507(a)(3), (4), (5), (6), and (7) are entitled to priority treatment. These types of Claims are entitled to priority treatment as follows: the Code requires that each holder of such a Claim receive cash on the Effective Date equal to the allowed amount of such Claim. However, a class of unsecured priority Claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such Claims.

The Debtor does not believe that there are any holders of priority non-tax Claims. To the extent that any allowed priority non-tax Claim is found to exist, such Claim shall be paid in full on the Effective Date of the Plan. Accordingly, the Plan makes no provision for a Class of Priority Unsecured Claims.

## C.        CLASSIFIED CLAIMS AND INTERESTS

### 1.        Class 1.        Secured Claim of Essex Ten

Class 1 shall consist of the Claims of Essex Ten, as the owner of the Existing Loan, which Claim is hereby deemed an Allowed Claim in the principal amount of $28,125,000, plus all accrued interest, penalties and fees that were unpaid on the Petition Date, to the extent secured by the Livingston Property and the Personal Property. Essex Ten's Secured Claim is of a limited recourse nature and Essex Ten shall not have, and by its affirmative vote in favor of the Plan waives, its Deficiency Claim.

Under the Plan and in accordance with the provisions of the RSA, Essex Ten will be merged into Daven Avenue with Daven Avenue surviving, which results in full satisfaction of the Existing Loan through: (y) the retirement of fifteen percent of the Existing Loan in exchange for $1,950,000 contributed by the Debtor and (z) forgiveness of the balance of the Existing Loan in exchange for KABR receiving a forty-seven and a half percent residual equity interest in Daven Avenue with priority on distributions in amounts equal to the sum of KABR's

15

Unrecovered Capital plus an eight percent return on such Unrecovered Capital as determined from time to time. Essex Ten's Secured Claim is impaired and it is entitled to vote on this Plan.

### 2.    Class 2.        General Unsecured Claims

The Allowed General Unsecured Claims are general unsecured claims not entitled to priority under Code Section 507(a), consisting of the G&S Livingston Liabilities and the Other Liabilities. The Allowed General Unsecured Claims will be paid in full on the Effective Date. The holders of General Unsecured Claims are not impaired under the Plan and therefore are not entitled to vote.

### 3.    Class 3.        Affiliated General Unsecured Claims

The allowed Affiliated General Unsecured Claims are general unsecured claims not entitled to priority under Code Section 507(a) that consist of claims held by entities affiliated with the Debtor that are neither G&S Livingston Liabilities nor Other Liabilities. Holders of Affiliated General Unsecured Claims shall receive a distribution of cash in an amount equal to two (2%) percent of their respective Affiliated General Unsecured Claims in full satisfaction of such Claims. The holders of Affiliated General Unsecured Claims are impaired under the Plan and therefore are entitled to vote.

### 4.    Class 4.        Equity Interest Holders

The Equity Interest Holders collectively own all of the shares of the stock in the Debtor. Upon the Effective Date of the Plan, the Equity Interest Holders will contribute to the Debtor cash in an amount equal to the sum of: (w) $1,950,000, (x) the Other Liabilities, (y) the Debtor Contribution Amount and (z) two percent (2%) of the amount owed for the Affiliated General Unsecured Claims. In return for this contribution, the Equity Interest Holders will retain their respective equity interests in the Debtor. The Equity Interest Holders are not impaired under the Plan and therefore are not entitled to vote.

16

**D.**      **Means Of Effectuating The Plan**

**1.**      **Effectuating The Plan**

The Plan will be effectuated by the Debtor and Daven Avenue entering into a series of transactions with KABR and Essex Ten that have been agreed to under the terms of the RSA, which is incorporated into the Plan by reference.  Upon Confirmation, and at the consummation of these transactions, the Debtor's Allowed General Unsecured Claims will be paid in full and the Reorganized Debtor will be a part owner of Daven Avenue, with Daven Avenue directly owning the Livingston Property free and clear of all the Existing Liens.  **While this Disclosure Statement summarizes the steps connected with effectuating the Debtor's Plan, all interested parties are encouraged to review the RSA attached hereto as Exhibit D for details related to the transactions contemplated by the Plan.  In the event of any conflict between the terms the Plan and the RSA, the terms of the RSA shall govern.**

Upon Confirmation of the Plan and prior to the Effective Date, the Equity Interest Holders will contribute to the Debtor cash equal to: (i) $1,950,000, (ii) the Other Liabilities, (iii) the Debtor Contribution Amount and (iv) two percent (2%) of the amount owed for the Affiliated General Unsecured Claims.  On the Effective Date, the Debtor will transfer to Daven Avenue: (x) the CVS Claim, (y) cash equal to $1,950,000, and (z) the Livingston Property, subject to the Existing Loan and the G&S Livingston Liabilities, although not subject to the Other Liabilities.  On the Effective Date, Essex Ten will be merged into Daven Avenue, with Daven Avenue surviving, which results in the full satisfaction of the Existing Loan through: (y) the retirement of fifteen percent of the Existing Loan in exchange for the $1,950,000 contributed by the Debtor and (z) forgiveness of the balance of the Existing Loan in exchange for KABR receiving a forty-seven and a half percent residual equity interest in Daven Avenue and with priority on distributions up to KABR's Unrecovered Capital plus an eight percent return on such

17

Unrecovered Capital as determined from time to time.  After the foregoing merger is effective, the Debtor and KABR will each make contributions equal to the Debtor Contribution Amount and KABR Contribution Amount respectively to Daven Avenue.  In connection with the foregoing merger, the Debtor, KABR and Joseph Lobuono shall enter into the Operating Agreement in the form set forth as Exhibit B to the RSA.  The parties may net the amounts payable by each party against amounts to be paid to each party so as to minimize the number of transfers of cash to be made on the Effective Date.

The Claims of Allowed General Unsecured Creditors will be paid in full by the Debtor as set forth in subsection 4 below.  The Claims of the Affiliated General Unsecured Creditors will be fully satisfied in return for a distribution equal to approximately two percent of the total amount of each Affiliated General Unsecured Creditor's Claim.  The Equity Interest Holders shall retain their present ownership interests in the Debtor in return for their contributions as set forth above.

### 2.        Post-confirmation Management

The Debtor plans to continue its existing management structure after Confirmation of the Plan.  The Debtor's post-Confirmation officers and directors shall serve in their capacities without compensation.

### 3.        Disbursing Agent

The Debtor shall act as the disbursing agent for the purpose of making distributions provided for under the Plan. The Disbursing Agent shall serve without a bond and shall not receive compensation for services rendered or expenses incurred acting pursuant to the Plan.

### 4.        Mechanism for Distributions to General Unsecured Claims

Payments to the Holders of Allowed General Unsecured Claims will be made by the Disbursing Agent on the Effective Date from an account that is funded as follows: (i) KABR will

18

deposit the KABR Contribution Amount and (ii) the Debtor will deposit the Debtor Contribution

Amount, an amount equal to the aggregate of Allowed Other Liabilities and an amount equal to

two percent (2%) of the amount owed for the Affiliated General Unsecured Claims.

### 5.        Disputed Claims Reserve

On or before the Effective Date, the Debtor shall establish a reserve, which shall be

maintained by the Disbursing Agent as part of the Disbursement Account, for all Disputed

Claims, if any, in an amount equal to the Face Amount of such Disputed Claim or such other

amount as may be determined by a Final Order of the Bankruptcy Court.  With respect to such

Disputed Claims, if, when, and to the extent any such Disputed Claim becomes an Allowed

Claim by Final Order, the relevant portion of the cash held in reserve therefore shall be

distributed by Disbursing Agent to the Holder of the Disputed Claim in a manner consistent with

distributions to similarly situated Allowed Claims.  The balance of such Cash, if any, remaining

after any particular Disputed Claims has been resolved and distributions made to the Holder of

such Claim in accordance with the Plan, shall be released and transferred to the Reorganized

Debtor.  No payments or distributions shall be made with respect to a Claim that is a Disputed

Claim pending the resolution of the dispute by Final Order or agreement of the parties.

Objections to Claims may be litigated to judgment or withdrawn, and may be settled with the

approval of the Bankruptcy Court, except to the extent such approval is not necessary as

provided in this section.  After the Effective Date, and subject to the terms of this Plan, the

Reorganized Debtor may settle any Disputed Claim where the result of the settlement or

compromise is an Allowed Claim in an amount of $10,000 or less without providing any notice

or obtaining an order from the Bankruptcy Court.  All proposed settlements of Disputed Claims

where the amount to be settled or compromised exceeds $10,000 shall be subject to the approval

of the Bankruptcy Court after notice and an opportunity for a hearing.

6.        **Exemption from Certain Transfer Taxes**

Pursuant to section 1146(a) of Bankruptcy Code, the issuance, transfer or exchange of any security or the making or delivery of any instrument of transfer under this Plan, including any documents reflecting the transfer of the Livingston Property, may not be taxed under any law imposing a stamp tax or similar tax.

7.        **CVS Litigation**

The counterclaims asserted by or on behalf of CVS shall not be discharged, released or otherwise affected by Confirmation of this Plan unless CVS files a proof of claim.  If CVS does not file a proof of claim, then the validity and amount of the counterclaim shall be determined by the District Court as part of the CVS Litigation and the amount of any claim or judgment that is determined by a Final Order of the District Court shall be satisfied either by (i) offset against and deduction from the CVS Claim, or (ii) paid by the Reorganized Debtor in the same manner as if this Plan had not been Confirmed.  If CVS does file a proof of claim, then the Bankruptcy Court shall have jurisdiction to determine the amount, if any, of such Claim; in such event, the Debtor reserves the right to remove the CVS Litigation to the Bankruptcy Court for determination.

E.    **Other Provisions Of The Plan**

1.        **Executory Contracts and Unexpired Leases**

a.    **Assumptions**

The following are the Assumed Contracts that will be assumed as obligations of the Reorganized Debtor under this Plan[3]:

a.    The Restructuring Support Agreement attached hereto as Exhibit A; and
b.    Rooftop Solar Power Agreement with SRMB LLC (c/o RNK Capital LLC) (the "Solar Power Agreement").

---

[3] The Debtor reserves the right to amend/revise this list of executory contracts and unexpired leases at any time prior to Confirmation of the Plan.

On the Effective Date, each of the Assumed Contracts listed above shall be assumed as obligations of the Reorganized Debtor and the Solar Power Agreement shall be assigned to Daven Avenue together with the Livingston Property.  The Order of the Court confirming the Plan shall constitute an Order approving the assumption and assignment of each Assumed Contract listed above.  Any monetary defaults under each Assumed Contracts to be assumed under this Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, in either of the following ways: (a) by payment of the default amount in Cash, in full on the Effective Date; or (b) by payment of the default amount on such other terms as may be agreed to by the Debtor and the non-Debtor parties to such Assumed Contract.  In the event of a dispute regarding (i) the amount or timing of any cure payments, (ii) the ability of the Debtor to provide adequate assurance of future performance under the Assumed Contract, or (iii) any other matter pertaining to assumption of the Assumed Contract, the Debtor shall pay all required cure amounts promptly following the entry of a Final Order resolving the dispute; provided, however, notwithstanding any other provision of this Plan, (a) with the written agreement of the counterparty to an Assumed Contract or (b) upon written notice to such counterparty, the Debtor may add any Assumed Contract to the list of rejected contracts if the Debtor determines, in its sole discretion, that it is not in its best interests to assume such Executory Contract considering the cure amount or any other terms of assumption as determined by the Bankruptcy Court in a Final Order.  To the extent that any party to an Assumed Contract asserts arrearages or damages pursuant to section 365(b)(1) of the Bankruptcy Code, or has any other objection with respect to any proposed assumption, revestment, cure or assignment on the terms and conditions provided herein, all such objections must be filed and served within the same deadline and in the same manner established for the filing and service of objections to Confirmation of the Plan.  Failure

2524357-09

to assert such objections in the manner described above shall constitute consent to the proposed assumption, revestment, cure or assignment on the terms and conditions provided herein, including an acknowledgement that the proposed assumption provides adequate assurance of future performance and that the amount identified for "cure", hereto is the amount necessary to cover any and all outstanding defaults under the Executory Contract to be assumed, as well as an acknowledgement and agreement that no other defaults exist under such contract or lease.

**b.** **Rejections**

On the Effective Date, all Executory Contracts not assumed shall be deemed to be rejected. The order confirming the Plan shall constitute an order approving the rejection of the lease or contract. If you are a party to an Executory Contract to be rejected and you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

**THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF A LEASE OR CONTRACT IS THIRTY (30) DAYS FROM THE EFFECTIVE DATE OF THE PLAN**.

Any Claim based on the rejection of an Executory Contract will be barred if the proof of claim is not timely filed, unless the Court later orders otherwise.

**2.** **Retention of Jurisdiction**

Under the Plan, notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Case until the Chapter 11 Case is closed, including jurisdiction to issue any other order necessary to administer the estate and enforce the terms of this Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

22

1.  To determine the type, Allowance and payment of any Claims upon any objections thereto (or other appropriate proceedings) by the Debtor or any other party-in-interest entitled to proceed in that manner;

2.  Except as otherwise limited herein, to recover all assets of the Debtor and property of the Debtor's Estate, wherever located;

3.  To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

4.  To hear any other matter not inconsistent with the Bankruptcy Code;

5.  To enter a final decree closing the Chapter 11 Case;

6.  To ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

7.  To decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters involving the Debtor that may be pending on or instituted after the Effective Date;

8.  To issue injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Plan, except as otherwise provided herein;

9.  To determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement;

23

10.     To enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

11.     To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof; and

12.     To resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Case, the Claims bar date, the hearing on the approval of the Disclosure Statement as containing adequate information, the hearing on the confirmation of the Plan for the purpose of determining whether a Claim is discharged hereunder or for any other purpose.

### 3.     Procedures for Resolving Contested Claims.

(a)     **Debtor Objection Deadline**.  The Debtor may file any objection to the allowance of a Claim against the Debtor with the Court and serve the objection on the holder of such Claim at any time before the administration of the Case has been completed and a final decree closing the Case has been entered, unless another date is established by the Court or by amendment to the Plan.  If the Debtor has not filed an objection to a Claim against the Debtor by the deadline established under the Plan, the Claim shall be treated as an Allowed Claim unless it is otherwise a Disputed Claim.

(b)     **Prosecution of Objections**.  The Debtor shall, in its sole discretion, litigate to judgment, settle or withdraw objections to Claims against the Debtor without further Court approval.  Rule 9019 of the Bankruptcy Rules does not apply to the settlement or withdrawal of any objection.

24

(c)      **Preservation of Objections**.  Except as otherwise provided in the Plan, the Confirmation Order or other Final Order, no compromise, waiver or release of Claims held by the Debtor that may be provided for in the Plan or in any Final Order shall in any way limit or impair the right of the Debtor to prosecute an objection to a Claim against the Debtor, and the Debtor hereby reserves all rights to object to the allowability of any Claim against the Debtor and reserves all defenses against any such Claim.  Notwithstanding the existence of a colorable objection to any Claim against the Debtor, the Debtor may, in its sole discretion, determine whether an objection to any Claim against the Debtor should be filed and may, in its sole discretion, decline to file or prosecute any objection to any Claim against the Debtor.

(d)      **No Distributions Pending Resolution of Objections**.  Notwithstanding any other provision of the Plan, no Distributions shall be made with respect to a Disputed Claim (or any portion of a Disputed Claim if such Claim is not severable) by the Debtor unless and until all objections to such Disputed Claim have been determined by a Final Order.  Distributions made after the Effective Date in respect of Claims that were not Allowed as of the Effective Date (but which later became Allowed) shall be deemed to have been made as of the Effective Date.

**4.      Effective Date**

**(a)      Conditions Precedent to the Effective Date**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived:

1.      the Confirmation Order, authorizing and directing that the Debtor take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, and other agreements or documents created in connection

with the Plan and the transactions contemplated thereby, including, without

limitation, the transactions contemplated by the RSA and the Operating

Agreement, shall have been entered and become a Final Order;

2.      the statutory fees owing to the United States Trustee shall have been paid in full;

3.      the RSA has been assumed by the Debtor pursuant to the Plan;

4.      all required contributions of cash and property under the RSA have been made;

5.      the transactions required by the RSA have been consummated;

6.      the Operating Agreement has been fully executed by all necessary parties; and

7.      all other actions, authorizations, consents and regulatory approvals required (if

any) and necessary to implement the provisions of the Plan and the RSA shall

have been obtained, effected or executed in a manner acceptable to the Debtor and

KABR.

### (b)      Effect of Failure of Condition

If each condition to the Effective Date has not been satisfied or duly waived by the

Debtor within sixty (60) days after the Confirmation Date, then upon motion by any party in

interest, including the Debtor, made before the time that each of the conditions has been satisfied

or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct,

the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that

notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of

the conditions to the Effective Date is either satisfied or duly waived by the Debtor, as the case

may be, before the Bankruptcy Court enters a Final Order granting such motion.   If the

Confirmation Order is vacated pursuant to this section, the Plan shall be deemed null and void in

all respects.

(c)      **Waiver of Conditions to the Effective Date**

The Debtor, in its sole discretion, may waive any or all of the conditions to the Effective Date, in whole or in part, at any time, without notice or an Order of the Bankruptcy Court.  In that event, the Debtor will be entitled to render any or all of its performance under the Plan prior to what otherwise would be the Effective Date if the above-referenced conditions were not waived, including, but not limited to, the right to perform under any circumstances which would moot any appeal, review, or other challenge of any kind to the Confirmation Order if the Confirmation Order is not stayed pending such appeal, review, or other challenge.  The failure to satisfy or to waive any condition may be asserted by the Debtor regardless of the circumstances giving rise to failure of such condition to be satisfied (including any action or inaction by the Debtor).  The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each such right will be deemed an ongoing right that may be asserted at any time.

## 5.      Modification

The Debtor may alter, amend or modify the Plan at any time prior to the Confirmation Date and thereafter as provided in Section 1127(b) of the Bankruptcy Code.

## IV.

## CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. The Debtor

CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a Plan. Some of the requirements include that the Plan must be proposed in good faith, that creditors or interest holders have accepted the Plan, that the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and that the Plan is feasible. These requirements are not the only requirements for confirmation.

## A.    Who May Vote or Object

### 1.    Who May Object to Confirmation of the Plan

Any party in interest may object to the Confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

### 2.    Who May Vote to Accept/Reject the Plan

A Creditor or interest holder has a right to vote for or against the Plan if that Creditor or interest holder has a Claim that is both (1) Allowed or allowed for voting purposes and (2) classified in an Impaired Class.

#### a.    What Is an Allowed Claim/Interest

As noted above, a Creditor or interest holder must first have an allowed claim or interest to have the right to vote. Generally, any proof of claim or interest will be Allowed, unless a party in interest brings a motion objecting to the Claim. When an objection to a Claim or interest is filed, the creditor or interest holder holding the Claim or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the Claim or interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE HAS NOT YET BEEN SET.

2524357-09

A Creditor or Equity Interest Holder may have an allowed Claim or interest even if a proof of Claim or interest was not timely filed. A Claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such Claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the Claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

### b.    What Is an Impaired Claim/Interest

As noted above, an Allowed Claim or interest only has the right to vote if it is in a Class that is Impaired under the Plan. A Class is Impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. In this case, the Debtor believes that Class 1 (Secured Claim of Essex Ten) and Class 3 (Affiliated General Unsecured Claims) are Impaired and that the holders of the Claims in these Classes are therefore entitled to vote to accept or reject the Plan. The Debtor believes that Class 2 (General Unsecured Claims), and Class 4 (Equity Interest Holders) are Unimpaired and that holders of Claims in each of these Classes therefore do not have the right to vote to accept or reject the Plan. Parties who dispute the's characterization of their Claim or interest as being Impaired or Unimpaired may file an objection to the Plan contending that the Debtor has incorrectly characterized the Class.

### 3.    Who Is Not Entitled to Vote

The following four types of Claims are not entitled to vote: (1) Claims that have been disallowed; (2) Claims in unimpaired classes (i.e. Classes 2 and 4); (3) Claims entitled to priority pursuant to Code Section 507(a)(1), (a)(2), and (a)(8); and (4) Claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Code Section 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Code.

Claims in Classes that do not receive or retain any value under the Plan do not vote because such Classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 4. Who Can Vote in More Than One Class

A Creditor whose Claim has been allowed in part as a Secured claim and in part as an Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the Claim and another ballot for the Unsecured Claim. The Debtor does not anticipate that any Creditor in this Chapter 11 Case will qualify to vote in more than one Class.

### 5. Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one Impaired Class has accepted the Plan without counting the votes of any insiders within that Class, and (2) all Impaired Classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting Classes.

### 6. Votes Necessary for a Class to Accept the Plan

A Class of Claims is considered to have accepted the Plan when more than one-half (½) in number and at least two-thirds (2/3) in dollar amount of the allowed Claims that actually voted, voted in favor of the Plan. A Class of interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the allowed interest-holders of such class which actually voted, voted to accept the Plan.

### 7. Treatment of Nonaccepting Classes

As noted above, even if all Impaired Classes do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by the Code. The process by which nonaccepting Classes are forced to be bound by the terms of

30

the Plan is commonly referred to as "cramdown".  The Code allows the Plan to be "crammed

down" on non-accepting classes of Claims or interests if it meets all consensual requirements

except the voting requirements of Section 1129(a)(8) and if the Plan does not "discriminate

unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the

Plan as referred to in 11 U.S.C. §1129(b) and applicable case law.

### 8. Request for Confirmation Despite Nonacceptance by Impaired Class(es)

The Debtor asks the Court to confirm this Plan by cramdown on impaired classes if any

of the above listed impaired classes do not vote to accept the Plan.

## B. Liquidation Analysis

The "best interests" of creditors test requires that each holder of a Claim receive or retain

under the Plan property of a value that is not less than the value such holder would receive or

retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.  To determine what

members of each impaired Class of Claims would receive if the Debtor were liquidated, the

Bankruptcy Court must determine the dollar amount that a liquidation of the Debtor's assets

would generate in the context of a Chapter 7 liquidation sale.  The amount available for

satisfaction of Claims would consist of the proceeds resulting from the sale, reduced by the

Claims of secured creditors, to the extent of the value of their collateral, and the costs and

expenses of the liquidation.

As set forth in the liquidation analysis attached hereto as Exhibit C, in the event of

liquidation, Essex Ten would have a lien on the Livingston Property and the Personal Property

and only Essex Ten would likely receive the majority of the Debtor's assets (either in money or

property) as a partial satisfaction of its Claim.  In such circumstances, the chapter 7 trustee would

likely abandon the Livingston Property and the first mortgagee would foreclose its mortgage.

31

Almost all other creditors, including administrative, priority and General Unsecured Creditors would receive a distribution from the Estate on account of their Claims that would be less than otherwise provided under the Plan. The Debtor has not analyzed potential avoidance actions in detail and do not intend to do so.

In contrast, under the proposed Plan, the Debtor has reached an agreement in the form of the RSA to provide for an infusion of capital from the Equity Interest Holders of the Debtor and KABR that will allow for full payment of the General Unsecured Creditors Claims, provide for a partial payment of the Affiliated General Unsecured Creditors Claims and provide for a complete extinguishment of the Secured Claim against the Debtor. The infusion of new capital contemplated by the RSA along with the remaking of the shopping center provides the necessary foundation to permit the Debtor to enter bankruptcy. Absent confirmation of the Plan and the infusion of this Capital and its related extinguishment of secured debt, the Creditors will receive little or no value on account of their Claims.

Accordingly, the Debtor believes that the Plan satisfies the "best interests" of creditors test.

## C.      The Feasibility Test

The "feasibility" test requires the Bankruptcy Court to find that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization of the Debtor.

Following the completion of the transactions anticipated by the Plan and in accordance with the RSA, the Debtor will no longer directly own the Livingston Property and will therefore not have any further need to accumulate debt in connection with the upkeep of the Livingston Property. One of the Debtor's assets and its primary source of income will be its ownership interest in Daven Avenue. The Debtor's Plan provides for KABR and the Equity Interest

32

Holders of the Debtor to contribute cash toward the Plan that will be used to make the distributions provided for under the Plan to certain Creditors on or near the Effective Date. These same contributions will also provide Daven Avenue, of which the Debtor will be part owner, with a source of working capital to utilize to refurbish the Livingston Property (free from the need to service a significant secured loan on the property) and pay its ongoing maintenance costs.  Under this arrangement, the Debtor will be able to make all of its required contributions under the Plan while no longer needing to invest continued resources into its business operation.

Accordingly, the Debtor believes that the Plan is feasible as proposed.

Other Requirements of Section 1129

The Debtor believes that the Plan meets all the other requirements of section 1129 of the Bankruptcy Code, including that the Plan has been proposed in good faith.

THE DEBTOR SHALL SEEK CONFIRMATION OF THE PLAN IF LESS THAN THE REQUISITE AMOUNTS OF CLAIMS OR INTERESTS IN ANY ONE OR MORE CLASSES VOTE TO ACCEPT THE PLAN.

**V.**

**<u>EFFECT OF CONFIRMATION OF PLAN</u>**

**A.    Discharge**

Upon Confirmation of the Plan, the Debtor shall, to the fullest extent allowable under the Bankruptcy Code, be discharged of liability for payment of all Claims of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred thereon, against the Debtor or any of its assets, properties or interests in property incurred before Confirmation.

If Confirmation of this Plan does not occur, the Plan shall be deemed null and void.  In such event, nothing contained in this Plan shall be deemed to constitute a waiver or release of

33

any Claims against the Debtor or its estate or any other persons, or to prejudice in any manner the rights of the Debtor or its estate or any person in any further proceeding involving the Debtor or its estate.  The provisions of this Plan shall be binding upon Debtor, all Creditors and all Equity Interest Holders, regardless of whether such Claims or Equity Interest Holders are impaired or whether such parties accept this Plan, upon Confirmation thereof.

**B.    Revesting of Property in the Debtor**

Except as provided in the Plan and in accordance wit the RSA and related transactions, the confirmation of the Plan revests all of the property of the estate in the Debtor.

**C.    Modification of Plan**

The Debtor may modify the Plan at any time before confirmation.  However, the Court may require a new disclosure statement and/or revoting on the Plan if the Debtor modifies the plan before confirmation.

The Debtor may also seek to modify the Plan at any time after confirmation so long as (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modification after notice and a hearing.  The Debtor further reserves the right to modify the treatment of any Allowed Claims at any time after the Effective Date of the Plan upon the consent of the Creditor whose Allowed Claim treatment is being modified, so long as no other Creditors are materially adversely affected.

**D.    Post-Confirmation Quarterly Fees**

Quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) continue to be payable to the Office of the United States Trustee post-confirmation until such time as the case is converted, dismissed, or closed pursuant to a final decree.

**VI.**

34

## GENERAL PROVISIONS

**A.      Settlement of Claims and Controversies; Releases and**

**Injunctions**

The provisions of the Plan shall constitute a good faith compromise and settlement of claims or controversies relating to the contractual and legal rights that a holder of a Claim may have with respect to any Claim, or any distribution to be made on account of such holder's Allowed Claim.

Except as otherwise provided in the Plan, the Confirmation Order will provide that all persons and entities who have held, hold, or may hold Claims against the Debtor are permanently enjoined, on and after the Confirmation Date, from (A) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, (B) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or Order against the Debtor or against the property or interests in property of the Debtor on account of any such Claim, (C) creating, perfecting or enforcing any encumbrance of any kind against the Debtor or against the property or interests in property of the Debtor on account of any such Claim and (D) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtor or against the property or interests in property of the Debtor on account of any such Claim.  Such injunction shall extend for the benefit of any successors of the Debtor and to any property and interests in property subject to the Plan.

**B.      Extensions of Time**

For cause shown, any deadlines set forth in the Plan which are applicable to the Debtor and which are not otherwise extendable, may be extended by the Bankruptcy Court.

2524357-09

**C.      Closing of the Case**

At such time as the Chapter 11 Case has been fully administered, the Debtor will file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable, Order of the Bankruptcy Court to close the Chapter 11 Case of G&S Livingston Realty, Inc.

**D.      Interest**

Unless otherwise specifically provided for in the Plan or the Confirmation Order, post-petition interest shall not accrue or be paid on Claims, and no holder of a Claim will be entitled to interest accruing on or after the Petition Date on any Claim.

**E.      Confirmation by Non-Acceptance Method**

The Debtor will request, if necessary, confirmation of the Plan pursuant to Bankruptcy Code section 1129(b) with respect to any impaired Class of Claims which does not vote to accept the Plan.

**F.      Severability**

The provisions of the Plan shall not be severable unless the Debtor agrees to such severance and such severance would constitute a permissible modification of the Plan pursuant to section 1127 of the Bankruptcy Code.

**G.      Governing Law**

Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent an exhibit to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New Jersey, without giving effect to the principles of conflicts of law of such jurisdiction.

**H.      No Admissions or Waivers**

2524357-09

Notwithstanding anything herein to the contrary, nothing contained in the Plan or in this Disclosure Statement shall be deemed an admission by any entity with respect to any matter set forth herein.  If the Plan is not confirmed (or, if confirmed, does not become effective), no statement contained herein or in the Plan may be used or relied on in any manner in any suit, action, proceeding or controversy within or outside of the Chapter 11 Case against the Debtor. The Debtor further reserves any and all of their rights as against all Persons in the event the Plan is not confirmed.

## I.    Successors and Assigns

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person or Entity.

## J.    Rounding of Distribution

Notwithstanding any other provision of the Plan, whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent, with one-half cent being rounded up to the nearest whole cent.

## K.    Undeliverable Distributions

Distributions will be delivered to the address of the holder of such Claim as indicated on the records of the Debtor, or a filed proof of Claim, as applicable.  If any Allowed Claim holder's distribution is returned as undeliverable, no further distributions shall be made to such Holder unless and until the Debtor is notified in writing of such holder's then-current address. Undeliverable distributions shall remain in the possession of the Debtor until such time as a distribution becomes deliverable.  In an effort to ensure that all holders of allowed Claims receive their allocated distributions, the Debtor will file with the Bankruptcy Court a listing of

unclaimed distribution holders.  This list will be maintained and updated as needed for as long as the Chapter 11 Case stays open.  Any holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable distribution within three (3) months after the first attempted delivery shall have its Claim for such undeliverable distribution discharged and shall he forever barred from asserting any such Claim against the Debtor, KABR, the Disbursing Agent, or their respective property.  In such cases, any cash held for distribution on account of such Claims shall be property of the Debtor, free of any restrictions thereon, and shall revert to the account from which such payment was originally issued to be distributed pursuant to the Plan.  Nothing contained in the Plan shall require the Debtor to attempt to locate any holder of an Allowed Claim.

**L.      Setoff and Recoupment Rights Preserved**

The Debtor and/or the Disbursing Agent may exercise the right of setoff or recoupment against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before distribution is made or account of such Claim), the claims, rights and causes of action of any nature that the Debtor may hold against the holder of such Allowed Claim. Setoff is an equitable right that allows parties to cancel or offset mutual debts to each other by asserting the amounts owed, subtracting one from the other, and paying only the balance.  Setoff avoids what has been called the "absurdity of making A pay B when B owes A."

In the context of the Plan, recoupment is the right of the Debtor and/or the Disbursing Agent to have an Allowed Claim reduced by reason of some claim the Debtor and/or the Disbursing Agent has against the holder of the Allowed Claim arising out of the very transaction giving rise to the Claim.

38

Although the Debtor and/or the Disbursing Agent has discretion to exercise the right of setoff or recoupment, neither the failure to effect a setoff or recoupment nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor and/or the Disbursing Agent of any such claims, rights and causes of action that the Debtor and/or the Disbursing Agent may possess against such holder.

**M.    Payment of Statutory Fees and Filing of Quarterly Reports**

All fees payable pursuant to 28 U.S.C. §1930, as determined by the Bankruptcy Court at or in conjunction with the Confirmation Hearing, will be paid on or before the Effective Date and, thereafter, pending entry of a final decree.  All quarterly reports of disbursements required to be filed by applicable bankruptcy law will be filed in accordance with applicable bankruptcy law.  The United States Trustee will continue to be paid by the Debtor until entry of the final order or decree, or upon conversion or dismissal of the Bankruptcy Case.

**N.    Exculpation**

To the extent allowed by Section 1125(e) of the Bankruptcy Code, neither the Debtor nor its officers or trustees, nor any of the Chapter 11 Professionals, nor the Disbursing Agent, nor KABR will have or incur any liability to any holder of a Claim or Interest, or any other party-in-interest, Person or Entity or any of their respective agents, employees, representatives, financial advisors, attorneys, affiliates or any of their successors or assigns, for any act or omission occurring after the Petition Date and in connection with, relating to, or arising out of the Chapter 11 Case, formulation, negotiation or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan except for their bad faith, willful malfeasance, reckless disregard of duty, gross negligence, willful fraud, willful

misconduct, self-dealing or breach of fiduciary duty as determined by a Final Order of the Bankruptcy Court.

**O.      Right to Revoke Plan Prior to Effective Date.**

The Debtor reserves the right to revoke or withdraw the Plan prior to the Effective Date and to file subsequent plans of reorganization.  If the Plan is withdrawn or revoked, or if confirmation or consummation of the Plan does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts affected by the Plan, and any document or agreement executed pursuant hereto, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against the Debtor or any other person, (ii) prejudice in any manner the Debtor's or any other Person's rights, or (iii) constitute the Debtor's or any other Person's admission of any sort.

**P.      Certain U.S. Federal Income Tax Consequences of the Plan**

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan which is for general information purposes only and does not purport to be a complete analysis or listing of all potential tax consequences.  Moreover, such summary should not be relied upon for purposes of determining the specific tax consequences of the Plan to the Debtor or with respect to a particular Claimant or Equity Interest Holder.  This summary assumes that the various indebtedness and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form.

The following summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder ("Regulations"), judicial decisions and published administrative rulings and pronouncements of the Internal Revenue

Service (the "IRS"), as in effect on the date hereof.  Legislative, judicial or administrative changes or interpretations enacted or promulgated hereafter could alter or modify the analysis and conclusions set forth below.  Any such changes or interpretations may be retroactive and could affect significantly the federal income tax consequences discussed below.

No ruling has been requested or obtained from the IRS with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto.  No representations or assurances are being made to Claimants or Equity Interest Holders with respect to the U.S. federal income tax consequences described herein.  This summary does not address foreign, state or local tax law, or any estate or gift tax consequences of the Plan.  Additionally, this summary does not purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions thrifts, small business investment companies, regulated investment companies, tax exempt organizations, certain expatriates, non-Debtor pass-through entities or investors in non-Debtor pass-through entities).

THE TAX CONSEQUENCES TO CLAIMANTS AND EQUITY INTEREST HOLDERS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH CLAIMANT OR EACH EQUITY INTEREST HOLDER IS URGED TO CONSULT ITS OWN TAX ADVISOR

REGARDING THE, FEDERAL, STATE, LOCAL AND, TO THE EXTENT APPLICABLE, FOREIGN TAX CONSEQUENCES OF THE PLAN.

**IRS CIRCULAR 230 DISCLOSURE**:  TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT: (1) ANY DISCUSSION OF THE U.S. FEDERAL INCOME TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY PERSON FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON SUCH PERSON; (2) ANY DISCUSSION OF U.S. FEDERAL INCOME TAX ISSUES IN THIS DISCLOSURE STATEMENT IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT; AND (3) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### 1.    U.S. Federal Income Tax Consequences to the Debtor.

(a)    Tax Classification of the Debtor and Transactions Contemplated by the Plan.

The Debtor is an S corporation for U.S. federal tax purposes and is the sole owner of the Livingston Property.  Pursuant to the Plan and the RSA, KABR, an entity wholly unrelated to the Debtor or the Equity Interest Holders, formed Essex Ten, a disregarded entity for U.S. federal tax purpose.  KABR capitalized Essex Ten with approximately $13,000,000 and Essex Ten purchased the Existing Loan.  Pursuant to the Plan and the RSA, the Equity Interest Holders will contribute certain cash to the Debtor.  Also pursuant to the Plan and the RSA, the Debtor will form Daven Avenue, a disregarded entity for U.S. federal tax purposes, and the Debtor, with the permission of Essex Ten, will contribute the Livingston Property to Daven Avenue, subject to the Existing Loan and the G&S Livingston Liabilities.  The Debtor will contribute cash of

42

$1,950,000 million to Daven Avenue and the CVS Claim. Immediately thereafter and pursuant to the Plan and the RSA, Essex Ten will be merged into Daven Avenue, with Daven Avenue surviving. The Existing Loan will be cancelled in exchange for $1,950,000 of cash and a forty seven and a half percent residual equity interest in Daven Avenue with priority on distributions up to KABR's Unrecovered Capital plus an eight percent return on such Unrecovered Capital (as determined from time to time) which the KABR and the Debtor have valued at approximately $11,050,000. Subsequently the Debtor and KABR will contribute additional cash to Daven Avenue to satisfy the G&S Livingston Liabilities in full and provide future operating capital. The Other Liabilities will be satisfied in full by the Debtor as part of the Plan from capital contributions made by the Equity Interest Holders. The amounts owed for the Affiliated General Unsecured Claims shall be satisfied for cash equal to two (2%) of the total amount owed under such Claims and previously contributed to the Debtor by the Equity Interest Holders.

      (b)      <u>Cancellation of Indebtedness Income Generally</u>.

Pursuant to the Tax Code and subject to certain exceptions, a taxpayer generally must include income from the cancellation of indebtedness ("COD Income") to the extent that such taxpayer's indebtedness is discharged for an amount less than the indebtedness' adjusted issue price determined in the manner described below. Generally, the amount of COD Income, subject to certain statutory and judicial exceptions, is the excess of (A) the adjusted issue price of the discharged indebtedness less (B) the sum of the fair market value (determined at the date of the exchange) of the consideration, if any, given in exchange for such discharged indebtedness including cash, property and the issue price of any new indebtedness determined under either Section 1273 or Section 1274 of the Tax Code, as applicable.

      (c)      <u>Bankruptcy Exception and the Reduction of Tax Attributes Generally</u>.

Section 108(a)(l)(A) of the Tax Code provides an exception to the recognition of COD Income, however, where a taxpayer discharging indebtedness is under the jurisdiction of a court in a case under title 11 of the Bankruptcy Code and where the discharge is granted, or is effected pursuant to a plan approved, by a U.S. Bankruptcy Court (the "Bankruptcy Exception").  Under the Bankruptcy Exception, instead of recognizing COD Income, the taxpayer is required, pursuant to Section 108(b) of the Tax Code, to reduce certain of that taxpayer's tax attributes to the extent thereof by the amount of COD Income.  The attributes of the taxpayer are generally reduced in the following order: (A) net operating losses (including "suspended losses" as discussed below), (B) general business credits, (C) minimum tax credits, (D) capital loss carryovers, (E) the basis of the taxpayer's assets, (F) passive activity loss and credit carryovers and (D) foreign tax credit tax carryovers (collectively, "Tax Attributes").

With respect to an S corporation, the Regulations attributable to Section 108 of the Tax Code state that the total amount of losses and deductions disallowed to an S corporation's shareholders because of a lack of basis in the taxable year of the discharge (or disallowed in a previous year and carried forward), which are commonly referred to as suspended losses, are treated as an S corporation's "deemed NOL" and are reduced in the order described immediately above.

If the amount of the COD Income is sufficiently large, it can eliminate the above favorable Tax Attributes.  To the extent the amount of COD Income exceeds the amount of Tax Attributes available to be reduced, such excess is excluded from income.  Pursuant to Section 108(b)(4)(A) of the Tax Code, the reduction of Tax Attributes does not occur until the end of the taxable year after such Tax Attributes have been applied to determine the tax in the year of

44

discharge or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD Income is realized.

Section 108(e)(2) of the Tax Code provides a further exception to the recognition of COD Income upon the discharge of debt, providing that a taxpayer will not recognize COD Income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for United States federal income tax purposes.  Unlike Section 108(b) of the Tax Code, Section 108(e)(2) does not require a reduction in the taxpayer's Tax Attributes as a result of the non-recognition of COD Income.  Thus, the effect of Section 108(e)(2) of the Tax Code, where applicable, is to allow a taxpayer to discharge indebtedness without recognizing income and without reducing its Tax Attributes.

For S corporations, such as the Debtor, the exclusion of COD Income under the Bankruptcy Exception and the corresponding reduction of Tax Attributes are applied at the entity level pursuant to Section 108(d)(7) of the Tax Code.  In addition, COD Income from the cancellation of indebtedness of an S corporation that is excluded from its income is not taken into account as an item of income by shareholders of the S corporation and thus does not increase the basis of a shareholder's stock.

(d)      Formation of Daven Avenue as a Partnership and Debtor's COD Income Attributable to the Plan.

The merger of Essex Ten into Daven Avenue, both of which were previously disregarded entities for U.S. federal income tax purposes immediately prior to such merger, should result in the formation of a partnership for U.S. federal income tax purposes between KABR and the Debtor.  Pursuant to the Plan and the proposed Operating Agreement of Daven Avenue incorporated therein, the Debtor will own a forty seven and a half percent residual equity interest

45

in Daven Avenue with priority on distributions up to the Debtor's Unrecovered Capital plus an eight percent return on such Unrecovered Capital as determined from time to time. The only other asset of the Debtor after such merger should be a shareholder receivable. Neither the contributions of assets to Daven Avenue prior to the merger nor the formation of Daven Avenue partnership as a result of the merger should not result in gain to the Debtor. Nonetheless, prior to any reduction of Tax Attributes attributable to the COD Income under the Bankruptcy Exception which are discussed below, the relief of liabilities resulting from formation of Daven Avenue as a partnership for U.S. federal income tax purposes and cancellation of the Existing Loan should result in a reduction, but not below zero, of the adjusted basis of the Debtor's partnership interest in Daven Avenue.

As noted above, the transactions contemplated under the Plan should result in the cancellation of the Existing Loan in exchange for cash and a partnership interest in Daven Avenue and cancellation of ninety-eight (98%) percent of the Affiliated General Unsecured Claims for cash equal to two (2%) percent of the total amount owed for such Claims. The Debtor reasonably believes should result in COD Income of approximately $23,000,000, although the exact amount of COD Income will not be known until at least the Confirmation Date. However, as a result of the Bankruptcy Exception and the Debtor being an S corporation for U.S. federal income tax purposes, such COD Income will not be included in the Debtor's gross income but rather the Tax Attributes of the Debtor should be reduced. Pursuant to the Bankruptcy Exception, the available Tax Attributes of the Debtor, other than reduction of the Debtor's adjusted basis in such entity's property, should occur at the end of the taxable year after such Tax Attributes have been applied to determine the tax in the year of discharge. Furthermore and with respect to the adjusted basis of the property of the Debtor, pursuant to Bankruptcy

46

Exception such adjusted basis of the property of the Debtor will be reduced or eliminated as of the first day of the taxable year following the taxable year in which the COD Income is realized on implementation of the Plan. Any COD Income in excess of the available Tax Attributes of the Debtor should be excluded under the Bankruptcy Exception. To the extent that the COD Income excluded as a result of the Bankruptcy Exception reduces the Debtor's available Tax Attributes, such reductions may ultimately result in a higher tax liability to the Debtor on, for example, future income earned or on future dispositions of assets owned by the Debtor at the beginning of the taxable year following the taxable year in which the Plan is confirmed. The Debtor believes there should not be any additional adverse U.S. federal income tax consequences to the Debtor as a result of implementation of the Plan.

(e)     Accrued Interest.

To the extent that the consideration issued to Claimants pursuant to the Plan is attributable to accrued but unpaid interest, the applicable Debtor should be entitled to interest deductions in the amount of such accrued interest, but only to the extent the applicable Debtor has not already deducted such amount. The Debtor should not have COD Income from the discharge of any accrued but unpaid interest pursuant to the Plan to the extent that the payment of such interest would have given rise to a deduction pursuant to Section 108(e)(2) of the Tax Code, as discussed above.

**2.     Federal Income Tax Consequences to Claimants**.

The U.S. federal income tax consequences to Claimants of the various transactions contemplated by the Plan, including the character, timing and amount of any income, gain or loss recognized by the Claimants upon consummation of the Plan, will depend upon the particular circumstances relevant to each Claimant. Claimants should therefore consult their own tax

47

advisors to determine the particular tax consequences to them of the various transactions contemplated by the Plan.

(a)   Accrued Interest.

To the extent that any amount received by a Claimant under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in a Claimant's gross income, such amount may be taxable to the Claimant as ordinary interest income. Conversely, a Claimant may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Claimant's gross income but was not paid in full by the Debtor. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Claimant will be attributable to accrued interest on the debts constituting the surrendered allowed Claim is unclear. Certain Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, distributions in respect of allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for creditors.

(b)   Federal Tax Consequences to KABR and Essex Ten.

48

2524357-09

As noted above, KABR purchased the Existing Loan through Essex Ten, a disregarded entity for U.S. federal tax purposes, for approximately $13,000,000. As a result, KABR, a partnership for U.S. federal income tax purposes, had an adjusted basis in the Existing Loan of equal to approximately $13,000,000. KABR and the Debtor, who are wholly unrelated to each other, valued the consideration indirectly transferred to KABR in exchange for the Existing Loan and pursuant to the Plan and the RSA at approximately $13,000,000. As also noted above, such consideration consists of a forty seven and a half percent residual equity interest in Daven Avenue with priority on distributions up to KABR's Unrecovered Capital plus an eight percent return on such Unrecovered Capital (as determined from time to time) and cash of $1,950,000.

Under the market discount rules, a debt obligation that is acquired by a holder in the secondary market is a "market discount bond" as to that holder if the sum of all remaining payments to be made on the debt instrument excluding "qualified stated interest" (or, in the case of a debt obligation having original issue discount, its adjusted issue price, determined in the manner described below) exceeds, by more than a statutory de minimis amount, the tax basis of the debt obligation in the holder's hands immediately after its acquisition. If a Claimant has accrued market discount with respect to its Claims and such Claimant recognizes gain upon the exchange of its Claims for property pursuant to the Plan, such Claimant may be required to include as ordinary income the amount of such accrued market discount to the extent of such recognized gain. To the extent such accrued market discount exceeds the gain such Claimant recognizes upon the exchange of its Claim for property pursuant to the Plan, such Claimant may be required to include as ordinary income the amount of such excess accrued market discount upon the disposition of the property received pursuant to the Plan. Under Section 1276 of the Tax Code, the market discount rules are applicable only to the extent that gain is recognized.

Essex Ten is disregarded for U.S. federal income tax purposes and, thus, the tax consequences resulting from confirmation of the Plan should be borne by KABR. The consideration exchanged for the Existing Loan should equal the adjusted basis KABR has in the Existing Loan and, as such, it is not anticipated that KABR will recognize any gain as a result of consummation of the Plan. Moreover, the deemed contribution of assets to Daven Avenue as a partnership for U.S. federal income tax purposes should not be a taxable event to KABR. Since, KABR is not anticipated to recognize any gain as a result of confirmation of the Plan; the market discount rules should not be applicable to KABR.

(3)    **Information Reporting and Backup Withholding**.

Certain distributions and exchanges made with respect to Claimants and Equity Interest Holders pursuant to the Plan may be subject to information reporting by the relevant Debtor-payor to the IRS. Moreover, such reportable distributions and exchanges may be subject to backup withholding (currently at a rate of twenty-eight percent) under certain circumstances. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL CLAIMANTS AND EQUITY INTEREST HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND, TO THE EXTENT APPLICABLE, FOREIGN TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

# VII.

## CONCLUSIONS AND RECOMMENDATION

The Debtor believes that the confirmation and implementation of this Plan is preferable to any other alternative.  Therefore, the Debtor recommends that all Creditors that are entitled to vote on the Plan vote to accept the Plan.

G & S Livingston Realty, Inc.
a New Jersey corporation


By:      /s/ *Gregg Wasser*
Name:  Gregg Wasser
Title:    President

Dated: July 1, 2011

51

2524357-09