# Exhibit D

(Restructuring Support Agreement)

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT ("*Agreement*") is made and entered into as of the 29th day of October, 2010 (the "*Effective Date*"), by and among (i) G&S Livingston Realty, Inc., a New Jersey corporation (the "*Company*"), (ii) KABR (as defined below). The Company and KABR are sometimes collectively referred to herein as the "Parties" and individually as a "Party."

The following exhibits are attached hereto and incorporated herein:

Exhibit A    Plan Term Sheet

Exhibit B    Amended and Restated Operating Agreement of Daven Avenue, LLC

Capitalized terms not defined in this introduction or in the recitals to this Agreement shall have the meanings assigned thereto in Section 1 hereof.

## RECITALS

WHEREAS, the Company owns 100% of the land, fixtures and improvements of the Daven Avenue Shopping Center located on Route 10 in Livingston, N.J. (the "*Livingston Property*"); and

WHEREAS, the Livingston Property is encumbered by a mortgage in the principal amount of $28.125 million, which was initially made by Barclays Capital Real Estate, Inc. and subsequently securitized and sold to the registered holders of Banc of America Commercial Mortgage Inc., Commercial Mortgage Pass-Through Series Certificates Series 2005-5 (the "*Existing Loan*"); and,

WHEREAS, two of the four tenants of the Livingston Property were liquidated in bankruptcy proceedings and the third and fourth tenants, exercised rights under their leases to vacate the Livingston Property because a specified portion of the Livingston Property was unoccupied; and

WHEREAS, the Company has initiated a claim against CVS for a lease guarantee executed in favor of the Company for the rent obligations of one of the bankrupted tenants (the "*CVS Claim*"); and,

WHEREAS, the Company currently has no source of revenue to (i) make payments due under the Existing Loan, or (ii) pay the expenses of insuring and maintaining the Livingston Property; and

WHEREAS, the Company has determined that a reduction in debt is necessary in order to attract new capital to refurbish the Livingston Property and make such property attractive to new tenants; and

**WHEREAS**, the Company has incurred various debts and claims from unaffiliated creditors attributable to the Company's maintenance and operation of the Livingston Property ("***G&S Livingston Liabilities***"), which it desires to pay in full in order to maintain critical relationships with unaffiliated suppliers and vendors necessary to maintain and operate the Livingston Property; and,

**WHEREAS**, the Company has determined that the most effective means to restructure its debt and attract needed capital investment would be through the confirmation of a plan of reorganization in a case commenced under chapter 11 of the Bankruptcy Code; and

**WHEREAS**, LaSalle Bank National Association, in its capacity as the administrator for the Existing Loan (the "***Securitization Administrator***"), will not waive provisions in the Company's charter required under the Existing Loan that prohibit the Company from commencing a case under the Bankruptcy Code; and

**WHEREAS**, the Securitization Administrator has indicated a willingness to sell and assign the mortgagee's interest under that the Existing Loan; and,

**WHEREAS**, KABR, is willing to acquire the Existing Loan; and

**WHEREAS**, after negotiation, KABR and the Company have agreed on a transaction ("***Transaction***") pursuant to which (i) KABR will acquire the Existing Loan and thereafter waive all restrictions on the commencement of a bankruptcy case by the Company and, pursuant to the Plan, allow the Company to transfer the Livingston Property to a limited liability company formed and wholly owned by the Company, and (ii) the Company will commence a case under chapter 11 of the Bankruptcy Code and use commercially reasonable efforts to obtain confirmation of a plan of reorganization in accordance with the Bankruptcy Code, on terms consistent in all respects with this Agreement; and,

**WHEREAS**, the Company has determined that the Transaction is advisable and in the best interests of its creditors and equity holders; and,

**WHEREAS**, entry into this Agreement is within the sound business judgment of the Company and is in furtherance of the fiduciary duties of the Company's officers and directors; and,

**WHEREAS**, this Agreement sets forth the terms and conditions of the Parties' respective obligations hereunder.

**NOW, THEREFORE**, in consideration of the foregoing, the promises and mutual covenants, conditions and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

Section 1.    <u>Definitions</u>.

"***Business Day***" shall mean any day, other than a Saturday, Sunday, or a legal holiday, as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure.

US_ACTIVE-104571785.12

***"Company Contribution Amount"*** means (i) an amount of cash equal to 50% of the sum of (x) the G&S Livingston Liabilities less (y) the Other Liabilities and (ii) $500,000.

***"Confirmation Date"*** shall mean the date of entry by the Bankruptcy Court of the Confirmation Order.

***"Confirmation Order"*** shall mean a final order of the Bankruptcy Court confirming the Plan pursuant to 11 U.S.C.  1129, the enforcement of which has not been stayed..

***"Disclosure Statement"*** shall mean the disclosure statement related to the Plan to be filed in the Chapter 11 Cases, which shall be in such form and substance as is reasonably satisfactory to the Parties and with any changes or modifications required by the Bankruptcy Court.

***"Effective Date"*** shall have the meaning set forth in the preamble hereto.

***"Existing Loan"*** shall have the meaning in the preamble hereto.

***"KABR"*** shall mean collectively, KABR Real Estate Investment Partners, LLC, a Delaware limited liability company, and any designee or assignee or entity that may be formed by it for the purposes of entering into and/or consummating the Transaction, each of which is deemed to be a party hereto.

***"KABR Contribution Amount"*** means (i) an amount of cash equal to 50% of the sum of (x) the G&S Livingston Liabilities less (y) the Other Liabilities and (ii) $500,000.

***"Milestones Covenant"*** shall mean the covenant by the Company not to take any action, and not to solicit, encourage or support any action by a third party, seeking to amend, annul, modify, or extend the Plan Milestones.

***"Other Liabilities"*** means unpaid liabilities due to unaffiliated creditors of the Company, accrued as of October 26, 2010 and which are not reflected on the schedule attached as Exhibit D to the Amended and Restated Operating Agreement of Daven Avenue, LLC, that will be paid in full by the Company pursuant to the Plan.

***"Petition Date"*** shall mean the date on which the Company shall have commenced the Chapter 11 Cases in the Bankruptcy Court.

***"Plan"*** shall mean a prearranged chapter 11 plan of reorganization for the Company consistent in all respects with the terms and conditions contained in the Plan Term Sheet.

***"Plan Effective Date"*** shall mean the effective date of the Plan.

***"Plan Milestones"*** shall have the meaning set forth in Section 6 hereof.

***"Plan Related Documents"*** shall mean the Plan and all documents required to effectuate the Plan or the Transaction, including, but not limited to, all documents and

US_ACTIVE-104571785.12

agreements contemplated by the Plan Term Sheet and, to the extent not included in the above, (a) the Disclosure Statement, (b) the materials related to the Solicitation, (c) the proposed Confirmation Order and (d) any other documents or agreements filed with the Bankruptcy Court that are necessary to implement the Plan, including any appendices, amendments, modifications, supplements, exhibits and schedules relating to the Plan or the Disclosure Statement.

*"Plan Term Sheet"* shall mean the term sheet attached hereto as Exhibit A.

*"Solicitation"* shall mean the solicitation of votes in respect of the Plan in the Chapter 11 Case.

*"Termination Date"* shall mean the date on which this Agreement is terminated in its entirety pursuant to Section 6 hereof.

*"Termination Event"* shall have the meaning set forth in Section 6 hereof.

*"Transfer"* shall have the meaning set forth in Section 31 hereof.

Section 2.    <u>Approval of the Plan Term Sheet and Related Agreements</u>.

(a)    The Parties severally acknowledge and agree that (i) the terms and conditions set forth in the Plan Term Sheet are acceptable in all respects to the Parties and their respective counsel and (ii) the Plan Related Documents shall contain terms and conditions consistent in all material respects with those set forth in the Plan Term Sheet.

Section 3.    <u>Bankruptcy Process</u>. The Company hereby agrees to use commercially reasonable efforts to obtain approval of this Agreement and confirmation and consummation of the Plan as soon as reasonably practicable on terms consistent in all respects with the Plan Term Sheet and this Agreement, and each Party shall use their commercially reasonable efforts to support confirmation and consummation of the Plan; provided, however, that the Company and KABR, may from time to time agree in writing to further extend any time period or deadline set forth herein as provided in this Agreement.

Section 4.    <u>Support of the Transaction; Additional Covenants</u>. From the Effective Date of the Agreement until the occurrence of a Termination Event (as defined herein), and subject to the conditions set forth in this Agreement, the Company and KABR, as applicable, agree and covenant that:

(a)    Prior to the Termination Date, no Party will:

(i)    object to confirmation of the Plan or object to or otherwise commence any proceeding to oppose, alter, delay or impede or take any other action, directly or indirectly, to interfere with entry of one or more orders approving the Plan or other Plan Related Documents;

(ii)    directly or indirectly seek, solicit, negotiate, vote for, consent to, support or participate in the formulation of any plan of reorganization or other restructuring of the Company other than the Plan;

- 4 -

(iii)    directly or indirectly seek, solicit, negotiate, support or engage in any discussions regarding any chapter 11 plan other than the Plan;

(iv)    object to the Solicitation or support any such objection by a third party; or

(v)    take any other action not required by law that is inconsistent with, or that would materially delay, the confirmation or consummation of the Plan or that is otherwise inconsistent with this Agreement.

(b)    Unless the Termination Date has occurred, (i) so long as its vote has been solicited in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code, including but not limited to its receipt of the Disclosure Statement, KABR agrees to (A) vote (or cause the voting of) its Claims arising from the Existing Loan to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the Solicitation and agrees that the solicitation period may be as short as five (5) Business Days; provided, however, that such vote shall be immediately revoked and deemed void *ab initio* upon termination of this Agreement pursuant to the terms hereof; and (B) not change or withdraw (or cause to be changed or withdrawn) such vote and (ii) KABR consents to the treatment of the Existing Loan as set forth in the Plan Term Sheet and the Plan. The Company hereby agrees that in the event this Agreement terminates by its terms, the Company shall not challenge or otherwise object to (i) the revocation of KABR's vote pursuant to this section or (ii) any action by KABR to confirm the revocation or cancellation of its vote.

(c)    Unless the Termination Date has occurred, KABR agrees to forbear in the exercise of any rights and remedies that the mortgagee may have under the Existing Loan and allow transfer of the G&S Livingston Property to a new single member limited liability company formed and wholly owned by the Company pursuant to the Plan.

(d)    In the event that the Termination Date occurs as a result of a termination Event defined in Section 6(a)(iii), (iv) or (v), the parties covenant and agree to negotiate in good faith to develop on an alternative means of implementing a restructure of the Existing Loan on terms that are substantially similar to those set forth in this Agreement.

(e)    Nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Case so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and the Transaction and are not for the purpose of and could not reasonably be expected to have the effect of, hindering, delaying or preventing the confirmation of the Plan or consummation of the Transaction pursuant to the Plan.

Section 5.    <u>Further Agreements.</u>

(b)    <u>Additional Transaction Matters.</u>    The Company hereby agrees (i) to use its reasonable best efforts to prepare or cause the preparation of the Plan and the other Plan Related Documents, (ii) to take all reasonably necessary and appropriate actions to achieve confirmation and consummation of the Plan and the Transaction contemplated therein, and (iii) that it shall provide to KABR draft copies of all pleadings and other documents it intends to file with the

- 5 -

US_ACTIVE-104571785.12

Bankruptcy Court in connection with the Chapter 11 Case, as soon as is reasonably practicable before such documents are filed with such court, all of which documents shall be consistent in all respects with the Plan Term Sheet.

(c)    Approvals. Each Party agrees to use its commercially reasonable efforts to (i) obtain Bankruptcy Court approval of this Agreement, confirmation of the Plan by the Bankruptcy Court and consummate the Transaction pursuant to the Plan and all other actions contemplated under the Plan Related Documents related thereto, (ii) take any and all necessary and appropriate actions in furtherance of the Transaction and the other actions contemplated under this Agreement, the Plan Term Sheet and the Plan Related Documents, (iii) obtain any and all required regulatory approvals and material third-party approvals for the Transaction and (iv) not take any actions inconsistent with this Agreement, the Plan Term Sheet or other Plan Related Documents.  Neither Party shall, directly or indirectly, seek, solicit, negotiate, support or engage in any discussions relating to or enter into any agreements relating to, any restructuring, plan of reorganization, dissolution, winding up, liquidation, reorganization, merger, transaction, sale or disposition (or all or substantially all of their assets or equity) other than as set forth in the Plan Term Sheet and the Plan, nor shall either Party solicit or direct any person or entity, including, without limitation, any member of any of the Parties' board of directors or, as to the Company, any holder of equity in the Company, to undertake any of the foregoing; provided, however, that the Parties may agree to modifications to the Plan Related Documents as provided in this Agreement.

Section 6.    Termination of this Agreement. Upon the occurrence of any of the following events (each, a "**Termination Event**"), this Agreement shall automatically terminate on the first calendar day immediately following one (1) Business Day after the date of such Termination Event unless KABR and the Company mutually agree to waive and enter into a written waiver of the Termination Events:

(a)    Failure to meet any of the following milestones (each a "Plan Milestone" and together, the "Plan Milestones"):

(i)    Motion to assume this Agreement filed by the Company on the Petition Date;

(ii)    Disclosure Statement and Plan consistent with the terms set forth in the Plan Term Sheet are filed with the Bankruptcy Court no later than 10 days after the Petition Date;

(iii)    Disclosure Statement consistent with the terms set forth in the Plan Term Sheet is approved by the Bankruptcy Court no later than 60 days after the Petition Date;

(iv)    Order confirming the Plan consistent with the terms set forth in the Plan Term Sheet entered by the Bankruptcy Court no later than 90 days after the Petition Date; and

(v)    Occurrence of the Plan Effective Date no later than 100 days after the Petition Date;

US_ACTIVE-104571785.12

(b)    KABR has not executed definitive agreements with respect to the acquisition of the Existing Loan, including all liens, security interests and encumbrances against the Livingston property associated with the Existing Loan, no later than 10 days after the date of this Agreement;

(c)    KABR has not consummated the acquisition of the Existing Loan, including all liens, security interests and encumbrances against the Livingston property associated with the Existing Loan, no later than 90 days after the date of this Agreement;

(d)    The filing by the Company of any motion or other request for relief seeking to (i) dismiss the Chapter 11 Case, (ii) convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or (iii) appoint a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in the Chapter 11 Case;

(e)    (i) The filing by the Company of any motion or other request for relief seeking an extension of the Plan Milestones or any alteration of the remedies upon termination set forth herein without the express written consent of KABR; (ii) the filing by the Company of any pleading supporting any motion from any other party to obtain such extension or alteration; (iii) the failure of the Company to oppose any motion from any other party to obtain such extension; or (iv) the violation by the Company of the Milestones Covenant;

(f)    The entry of an order by the Bankruptcy Court (i) dismissing the Chapter 11 Case, (ii) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or, (iii) appointing a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in the Chapter 11 Case;

(g)    The withdrawal, amendment or modification by the Company of, or the filing by the Company of a pleading seeking to amend or modify, the Plan or this Agreement, which withdrawal, amendment, modification or pleading is materially inconsistent with the terms set forth in the Plan Term Sheet or the Plan or is materially adverse to KABR, in each case in a manner not reasonably acceptable to KABR, or if the Company files any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with the terms set forth in the Plan Term Sheet or the Plan (in each case with such amendments and modifications as have been effected in accordance with the terms set forth in the Plan Term Sheet) and such motion or pleading has not been withdrawn within three (3) Business Days;

(h)    The filing of any motion to approve a Disclosure Statement or Plan by the Company that incorporates any terms inconsistent with the terms and conditions set forth in the Plan Term Sheet;

(i)    The granting by the Bankruptcy Court of relief that is inconsistent with the terms set forth in the Plan Term Sheet or the Plan in any material respect (in each case with such amendments and modifications as have been effected in accordance with the terms set forth in the Plan Term Sheet);

(j)    The issuance by any governmental authority, including the Bankruptcy Court or any other regulatory authority or court of competent jurisdiction, of any ruling, determination or order making illegal or otherwise restricting, preventing or enjoining the

- 7 -

US_ACTIVE-104571785.12

consummation of a material portion of the Transaction, including an order denying confirmation of the Plan and such ruling, determination or order has not been vacated or reversed within five (5) Business Days of issuance;

(k)    The material breach by any Party of any of their undertakings, representations, warranties or covenants set forth in this Agreement; and

(l)    All Parties agree in writing to terminate this Agreement.

The foregoing Termination Events are intended solely for the benefit of the Parties to this Agreement; *provided* that no Party may seek to terminate this Agreement based upon a material breach or a failure of a condition (if any) in this Agreement arising out of its own actions or omissions.

Section 7.    Default Notices. The Company shall furnish to KABR prompt written notice of any Termination Event as soon as it becomes aware that the Termination Event will occur, specifying the nature and extent thereof and the corrective action, if any, taken or proposed to be taken with respect thereto.

Section 8.    Effect of Termination. Upon occurrence of a Termination Event, this Agreement shall be of no further force and effect and each Party hereto shall be released from its commitments, undertaking, and agreements under or related to this Agreement except (i) to the extent provided in Section 13 of this Agreement.

Section 9.    Good Faith Cooperation; Further Assurances; Transaction Documents. The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Transaction. Furthermore, each of the Parties shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary to carry out the purposes and intent of this Agreement. Each Party hereby covenants and agrees (a) to negotiate in good faith the Plan Related Documents, each of which shall (i) contain the same economic terms as and other terms consistent in all material respects with, the terms set forth in the Plan Term Sheet, (ii) be in form and substance acceptable in all respects to each of the Company and KABR and (iii) be consistent with this Agreement in all material respects and (b) to execute the Plan Related Documents subject to the terms of this Agreement (to the extent such Party is a party thereto).

Section 10.    Representations and Warranties. Each Party hereby represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof and as of the date of any amendment of this Agreement approved by such Party:

(t)    No Conflicts. To the Parties' actual knowledge, the execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (A) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

- 8 -

US_ACTIVE-104571785.12

(u)      Governmental Consents. The execution, delivery and performance by such Party of this Agreement does not and shall not require any registration or filing with, consent or approval of or notice to or other action to, with or by, any Federal, state or governmental authority or regulatory body other than the Bankruptcy Court.

(v)      Binding Obligation. This Agreement is the legally valid and binding obligation of such Party, enforceable against it, and its officers, directors and agents, in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

Section 11.    Effectiveness. This Agreement shall become effective and binding on each Party upon the receipt by counsel for the Company of signature pages executed by the Company and KABR.  Delivery by telecopier or electronic mail of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart hereof.

Section 12.    GOVERNING LAW; JURISDICTION; JURY TRIAL WAIVER. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL COURT IN THE STATE OF NEW YORK AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH    RESPECT    TO    ANY    SUCH    ACTION,    SUIT    OR    PROCEEDING. NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, UPON THE COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT PRESIDING OVER THE CHAPTER 11 CASES SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREIN.

Section 13.    Specific Performance; Exclusive Remedy. Each Party hereto recognizes and acknowledges that a breach by it of any covenants or agreements contained in this Agreement will cause the other Party to sustain damages for which such Party would not have an adequate remedy at law for money damages, and therefore each Party hereto agrees that in the event of any such breach the other Parties shall be entitled to the remedy of specific performance of such covenants and agreements and injunctive relief, without the necessity of securing or posting a bond or other security in connection with such remedy. Notwithstanding anything to the contrary set forth above, the Parties also agree that the remedy of specific performance shall

US_ACTIVE-104571785.12

be the exclusive remedy of the Parties under this Agreement in the event of a breach of this Agreement by another Party hereto.

Section 14.    <u>Survival</u>. Notwithstanding the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Sections 4(d), 7, 11, 12, 14, 16, 17 and 22 hereof shall survive such termination and shall continue in full force and effect for the benefit of the Parties hereto in accordance with the terms hereof.

Section 15.    <u>Headings</u>. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

Section 16.    <u>Successors and Assigns; Severability; Several Obligations</u>.   This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives.   The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction. The agreements, representations and obligations of the Parties under this Agreement are, in all respects, several and not joint.

Section 17.    <u>No Third Party Beneficiaries</u>. Unless otherwise expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third party beneficiary hereof.

Section 18.    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations, but shall not supersede either of the Plans or the other Plan Related Documents.

Section 19.    <u>Counterparts</u>. This Agreement and any amendments, waivers, consents or supplements hereto or in connection herewith may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

Section 20.    <u>Notices</u>. All demands, notices, requests, consents and other communications under this Agreement shall be in writing, sent contemporaneously to all of the Parties (unless otherwise stated in the Agreement) and deemed given when delivered, if delivered by hand or upon confirmation of transmission, if delivered by email and facsimile, during standard business hours (from 8:00 A.M. to 6:00 P.M. at the place of receipt) at the addresses and facsimile numbers set forth below:

**If to the Company:**

G&S Livingston Realty, Inc.
211 E. 43rd Street
25th Floor
New York, NY 10017

- 10 -

US_ACTIVE-104571785.12

Telephone: 212-286-3300
Facsimile: 914-937-7123
email: gsinvestor@aol.com

with a copy to

Michael A. Meyers, Esq
Reed Smith LLP
599 Third Avenue
New York, NY 10022-9998

Telephone: 212-549-0303
Facsimile: 212-541-5450
email: mme yers@reedsmith.com

**If to KABR:**

KABR Real Estate Investment Partners, LLC
Suite #220
10 Forest Avenue
Paramus, NJ 07652

Telephone: 201-845-2555
Facsimile: 201-843-0745
email: lrappaport@ljrlaw.com

with a copy to

Laurence J. Rappaport Esq.
c/o KABR Real Estate Investment Partners, LLC
Suite #220
10 Forest Avenue
Paramus, NJ 07652

Telephone: 201-845-2555
Facsimile: 201-843-0745
Email: lrappaport@ljrlaw.com

    Section 21.    <u>Rule of Interpretation; Calculation of Time Period</u>. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto. None of the Parties hereto shall have any term or provision construed against such Party solely by reason of such Party having drafted the same. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

    Section 22.    <u>Reservation of Rights</u>. Nothing herein shall be deemed an admission of any kind. If the transactions contemplated herein are not consummated or this Agreement is

- 11 -

US_ACTIVE-104571785.12

terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

Section 23.    Publicity; Confidentiality. The Parties understand and acknowledge that, until publicly disclosed as herein contemplated, the terms of this Agreement and the exhibits hereto are confidential information, and the Parties agree to keep such information confidential and not use it for any purpose except as contemplated hereby or as reasonably necessary in the Chapter 11 Case.

Section 24.    Representation by Counsel. Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

Section 25.    Acknowledgement. This Agreement and the Transactions are the product of negotiations among the Parties, together with their respective representatives.    This Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Plan or any plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. KABR's vote will not be solicited until it has received the Disclosure Statement and any other required materials related to the Solicitation.

Section 29.    No Waiver. The failure of any Party hereto to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity or to insist upon compliance by any other Party hereto with its obligations hereunder and any custom or practice or the Parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such right, power or remedy or to demand such compliance.

Section 30.    Modification. This Agreement may only be modified, altered, amended, or supplemented by an agreement in writing signed by the Company and KABR.

Section 31.    Transfers. KABR agrees that until the earlier to occur of (x) termination of this Agreement in accordance with Section 6 and (y) the occurrence of the Plan Effective Date, it shall not sell, transfer, pledge, assign or otherwise hypothecate the Existing Loan or any right or interest (voting or otherwise) therein (any such transfer, pledge, assignment, hypothecation or option being referred to as a "Transfer"), unless such Transfer is subject to, and the transferee thereof agrees in writing for the benefit of the Company to be bound by all of the terms of this Agreement by executing and delivering to the Parties a joinder in a form reasonably acceptable to the Company. Any Transfer that is made in violation of the immediately preceding sentence shall be null and void *ab initio*, and the Company shall have the right to enforce the voiding of such transfer. In the event that any Transfer is not fully consummated for any reason, KABR shall remain bound by the terms of this Agreement. After a Transfer, the Company has the right to terminate this Agreement upon one (1) day's written notice by the Company. Notwithstanding the foregoing, if KABR notifies the Company of a potential Transfer, the

US_ACTIVE-104571785.12

Company shall advise KABR within five (5) business days if it will exercise its termination right with respect to such Transfer.

[Signature Page Follows]

*****

THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK

US_ACTIVE-104571785.12

**IN WITNESS WHEREOF**, intending to evidence their respective acceptance of, and agreement to, the foregoing terms, the parties have caused this Agreement to be executed and delivered as of the date first written above.

**G&S Livingston Realty, Inc.,**
a New Jersey corporation

By: _____
Name: Gregg Wasser
Title:

**KABR Real Estate Investment Partners, LLC**,
a Delaware limited liability company, *for itself and on behalf of any designee or assignee or entity that may be formed by it for purposes of effectuating the Transaction*

By: KABR Management, LLC, a Delaware limited liability company

By: _____
Name: Laurence J. Rappaport, Esq.
Title:

- 14 -

US_ACTIVE-104571785.12

**EXECUTION COPY**

## **Exhibit A**

**(The Plan Term Sheet)**

**Term Sheet**

**Illustrative Terms of Proposed Restructuring**

The following are the proposed principal terms of a restructuring transaction by and among G&S Livingston Realty, Inc. (the "***Company***") and KABR Real Estate Investment Partners, LLC, a Delaware limited liability company ("***KABR***") relating to the business of the Company as it relates to the ownership and operation of a shopping center in Livingston, New Jersey (the "***Livingston Property***").

The transaction (the "***Transaction***") contemplates that (i) KABR will form Essex Ten Financial, LLC ("***Essex***"), a New Jersey limited liability company, to purchase a mortgage encumbering the Livingston Property in the principal amount of $28.125 million, which was initially made by Barclays Capital Real Estate, Inc. and subsequently securitized and sold to the registered holders of Banc of America Commercial Mortgage Inc., Commercial Mortgage Pass-Through Series Certificates Series 2005-5 (the "***Existing Loan***") for $13 million; (ii) after such purchase, Essex will permit the Company to enter into a chapter 11 reorganization and forgo any claims or remedies under the Existing Loan, including the waiver of guaranties and the collection of any interest due, during the pendency of the bankruptcy case and allow the Livingston Property to be contributed to a wholly owned Delaware limited liability company formed by the Company ("***Daven Avenue***") pursuant to the confirmed bankruptcy plan of reorganization; (iii) pursuant to such confirmed bankruptcy plan of reorganization: (A) the shareholders of the Company will contribute to the Company cash equal to (x) $1.95 million (z) the Other Liabilities and (z) the Company Contribution Amount; (B) the Company will contribute to Daven Avenue: (x) the CVS Claim, (y) cash equal to $1.95 million and (z) the Livingston Property, subject to the Existing Loan and the G&S Livingston Liabilities, although not subject to the Other Liabilities; (C) Essex will be merged into Daven Avenue with Daven Avenue surviving which results in full satisfaction of the Existing Loan through: (y) the retirement of 15% of the Existing Loan in exchange for the $1.95 million contributed by the Company and (z) forgiveness of the balance of the Existing Loan in exchange for KABR receiving an approximately 50% equity interest in Daven Avenue and a preference on certain distributions to the extent of $11.05 million; (D) subsequent to the foregoing merger, the Company and KABR will each make contributions equal to the Company Contribution Amount and KABR Contribution Amount respectively to Daven Avenue; (E) the claims of unaffiliated unsecured creditors representing the G&S Livingston Liabilities less the Other Liabilities will be paid in full by Daven Avenue from the KABR Contribution Amount and the Company Contribution Amount contributed by the Company and KABR; (F) the Company will pay the Other Liabilities in full and (G) the claims of affiliated unsecured creditors will be extinguished in the bankruptcy.

The Transaction will be effectuated through a prearranged plan of reorganization (the "***Plan***") in chapter 11 bankruptcy cases filed by the Company (the "***Chapter 11 Case***") in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***"). This term sheet has been prepared as the basis for the drafting of a definitive plan of reorganization which will be the subject of the Chapter 11 Case.

The terms discussed herein constitute an integrated offer, are not divisible except as described herein, and are subject to the terms and conditions hereof.  This term sheet is provided in confidence and may be distributed only with the express written consent of the Company and KABR, as applicable.   This term sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the definitive documentation governing such matters, which remain subject to discussion and negotiation to the extent not inconsistent with the specific matters set forth herein.

**THIS TERM SHEET IS NOT A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN.  ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE.**

US_ACTIVE-104571785.12

**Terms:**

| Treatment of Claims and Equity Interests Under the Plan: | |
|---|---|
| Existing Mortgage | Pursuant to the Plan Essex will merge with and into Daven Avenue with Daven Avenue surviving.  KABR will receive, as a result of such merger, (i) approximately 50% of Daven Avenue and a preference on certain distributions to the extent of $11.05 million in consideration of extinguishment of 85% of the Existing Loan and (ii) $1.95 million, previously contributed by the Company, to extinguish 15% of the Existing Loan.<br><br>Following confirmation and after the Effective Date, KABR and the Company will be equal partners in Daven Avenue, a partnership for tax purposes, which will be governed by the Amended and Restated Operating Agreement in the form annexed to the Restructuring Support Agreement. |
| General Unsecured Claims | "General Unsecured Claim" shall mean any unsecured claim against any of the Debtors that is not: (a) an Administrative Claim; (b) a Priority Claim (tax or otherwise); (c) a section 510(b) claim, if any; and (d) that is not held by an affiliate of the Debtor. General Unsecured Claims will be paid in full upon confirmation and will therefore be deemed unimpaired and will not be entitled to vote to accept the Plan. |
| Deficiency Claims | Unsecured deficiency claims of the holder of the Existing Loan shall be waived and KABR is deemed to have consented to such waiver. |
| Administrative Claims | Allowed administrative claims shall be paid in cash in the ordinary course of business. |
| Priority Claims | Allowed priority claims shall be paid in cash on the Effective Date; *provided*, that on the Effective Date KABR and the Company may determine to defer any priority tax claims in accordance with the Bankruptcy Code. |

- 18 -

US_ACTIVE-104571785.12

| | |
|---|---|
| Existing Equity | All existing equity of the Company will survive the confirmation. |

**Means of Implementation:**

| | |
|---|---|
| Bankruptcy Pleadings | The Plan and Disclosure Statement filed by the Company in connection with the Chapter 11 Case shall be in form and substance reasonably acceptable to KABR. |
| Exit Financing | To implement the Plan, KABR will contribute the KABR Contribution Amount and the Company will contribute the Company Contribution Amount to Daven Avenue. Using such contribution amounts, Daven Avenue will pay the G&S Livingston Liabilities less the Other Liabilities in full.  As part of the Plan the Company will pay the Other Liabilities in full.  KABR and the Company will determine the total amount of applicable closing costs paid by KABR and the Company and reimburse each other, as applicable, so that the members have each paid 50% of the cumulative closing costs.  All liabilities, other than the G&S Livingston Liabilities and the Connell Foley Amount, owed to affiliates of the Company will be extinguished pursuant to the Plan. |
| Conditions Precedent | The Transaction will become binding when KABR and the Company execute a restructuring support agreement that incorporates the Transaction |
| Governance | Following the Effective Date, each of the members of Daven Avenue will have a capital account equal to the total amount of net cash and the fair market value of property contributed.  More specifically, KABR will have an initial capital account of $11.05 million plus the KABR Contribution Amount and the Company will have an initial capital account of $1.95 million plus the Company Contribution Amount.

In addition, each member will have a first tranche of unrecovered capital equal to the amount of capital initially invested in Daven Avenue which for KABR would be $11.05 million and for the Company would be $1.95 million ("**Unrecovered Capital**").  The members will have a second tranche of unrecovered capital equal to |

US_ACTIVE-104571785.12

the Company Contribution Amount and the KABR Contribution Amount, as applicable after the merger of Essex into Daven Avenue pursuant to the Plan which will be used to pay in full the G&S Livingston Liabilities and meet the operating needs of Daven Avenue (**"Operating Unrecovered Capital"**).

To the extent that KABR's Unrecovered Capital is in excess of 70% of the members' total Unrecovered Capital (the **"Disequilibrium Amount"**), KABR shall receive all distributions attributable to cash flow and capital transactions (i.e., sales and financings) until such Disequilibrium Amount is reduced to zero.

Once the Disequilibrium Amount has been reduced to zero, the members shall receive distributions attributable to cash flow and capital transactions proportionately based upon their relative Unrecovered Capital amounts until each of such members' Unrecovered Capital are reduced to zero.

Once the members' Unrecovered Capital have been reduced to zero, the members shall receive distributions attributable to cash flow and capital transactions proportionality based upon initial Unrecovered Capital amounts until such members receive a preferred return of 8% on such initial Unrecovered Capital.

Once the members have received their preferred return on their initial Unrecovered Capital, the members shall receive distributions attributable to cash flow and capital transactions proportionately based upon their relative Operating Unrecovered Capital until each of such members receive a preferred return of 8% on their Operating Unrecovered Capital.

Once the members' Operating Unrecovered Capital have been reduced to zero, the members shall receive distributions attributable to cash flow and capital transactions proportionately based upon their relative Operating Unrecovered Capital until each of such members' Operating Unrecovered Capital are reduced to zero

Finally, once the members' Operating Unrecovered Capital have been reduced to zero, any excess distributions attributable to cash flow and capital transactions shall be distributed 47.5% to KABR, 47.5% to G&S Livingston and 5% to Joseph Lubuono.  Joseph Lobuono's residual interest of 5% is granted as a result of his provision of consulting services and for facilitating the consummation of this transaction.

Distributions attributable to the CVS Claim shall be made equally to the Company and KABR.

US_ACTIVE-104571785.12

# Exhibit B

# Amended and Restated Operating Agreement

# of

# Daven  Avenue, LLC

US_ACTIVE-104571785.12

**EXECUTION COPY**

# AMENDED AND RESTATED

# OPERATING AGREEMENT

# OF

# DAVEN AVENUE, LLC

# TABLE OF CONTENTS

**Page**

**ARTICLE ONE DEFINED TERMS** ................................................................ **3**
  1.1   Defined Terms ................................................................................ 3

**ARTICLE TWO NAME; PLACE OF BUSINESS AND OFFICE; PURPOSE; TERM** .... **15**
  2.1   Formation of Company ...................................................................... 15
  2.2   Name; Place of Business and Office. ........................................................ 15
  2.3   Purpose .................................................................................... 15
  2.4   Term ...................................................................................... 16
  2.5   Members ................................................................................... 16

**ARTICLE THREE CAPITAL** ......................................................................... **16**
  3.1   Capital Contributions ....................................................................... 16
  3.2   Capital Accounts; Allocations; Other Matters Pertaining to Capital .......................... 19

**ARTICLE FOUR COVENANTS, REPRESENTATIONS AND WARRANTIES** ............. **23**
  4.1   Covenants, Representations and Warranties of G&S Livingston and the Company ............ 23
  4.2   Covenants, Representations and Warranties of KABR and Essex............................... 25

**ARTICLE FIVE MEMBERS** ........................................................................... **26**
  5.1   Limited Liability of Members................................................................ 26
  5.2   Transactions with the Company ............................................................. 26
  5.3   Remuneration of Members .................................................................. 27
  5.4   Members Are Not Agents ................................................................... 27
  5.5   Voting Rights............................................................................... 27

**ARTICLE SIX MANAGEMENT AND CONTROL OF THE COMPANY** ...................... **27**
  6.1   Management of the Company by the Managers .............................................. 27
  6.2   Appointment of Managers .................................................................. 28
  6.3   Powers of Managers ....................................................................... 29
  6.4   Annual Budget and Decisions. .............................................................. 34
  6.5   Indemnification of Managers and Affiliates ................................................. 36
  6.6   Interested Managers ....................................................................... 39
  6.7   Limited Liability of Managers............................................................... 39
  6.8   Removal of a Manager, the Managing Agent or Termination of a Right to Receive a Consulting Fee .. 40
  6.9   Tax Matters Partner ....................................................................... 40
  6.10  Officers & Employees ...................................................................... 41
  6.11  Tax Status ................................................................................. 41

**ARTICLE SEVEN TRANSFER OF MEMBERSHIP INTERESTS AND INDIRECT
INTEREST** ............................................................................................. **41**
  7.1   Restrictions on Transfer; First Refusal Rights ............................................... 41
  7.2   Permitted Transfer. ........................................................................ 43
  7.3   Prohibited Transfer. ....................................................................... 44
  7.4   Pre-emptive Rights ........................................................................ 45
  7.5   Admission of Additional or Substitute Members ............................................ 47
  7.6   Substitute or Additional Member ........................................................... 47
  7.7   Withdrawal of Members .................................................................... 48
  7.8   Obligations of Transferring Member ........................................................ 48
  7.9   Deceased, Incompetent or Dissolved Member .............................................. 49

US_ACTIVE-103768707.25

**ARTICLE EIGHT DISTRIBUTIONS** ................................................................. **49**
  8.1   Distributions Attributable to Net Cash Flow from Operations and Capital Transactions ........ 49
  8.2   CVS Proceeds ........................................................................................ 50
  8.3   Amounts Withheld .................................................................................. 50
  8.4   Limitations on Distributions .................................................................... 51
  8.5   Return of Distributions ........................................................................... 51

**ARTICLE NINE DISSOLUTION, LIQUIDATION AND TERMINATION OF THE
COMPANY** ........................................................................................ **51**
  9.1   Events Causing Dissolution and Termination ............................................... 51
  9.2   Liquidation .......................................................................................... 52

**ARTICLE TEN BOOKS AND RECORDS; ACCOUNTING; REPORTS; TAX
ELECTIONS** ....................................................................................... **54**
  10.1  Books and Records ............................................................................... 54
  10.2  Bank Accounts .................................................................................... 55
  10.3  Reports to Members ............................................................................. 55
  10.4  Tax Elections ..................................................................................... 55

**ARTICLE ELEVEN AMENDMENTS** ...................................................... **56**
  11.1  Adoption of Amendments ...................................................................... 56

**ARTICLE TWELVE CONSENTS, VOTING AND MEETINGS** ............. **57**
  12.1  Method of Giving Consent ..................................................................... 57
  12.2  Meetings of Members ........................................................................... 58
  12.3  Submission to the Members ................................................................... 58
  12.4  Proxy ................................................................................................ 59
  12.5  Action by Members Without a Meeting .................................................... 59

**ARTICLE THIRTEEN MISCELLANEOUS PROVISIONS** .................... **59**
  13.1  Notification ........................................................................................ 59
  13.2  Binding Provisions ............................................................................... 60
  13.3  Applicable Law .................................................................................... 60
  13.4  Counterparts ....................................................................................... 61
  13.5  Severability of Provisions ...................................................................... 61
  13.6  Entire Agreement ................................................................................ 61
  13.7  Variation of Pronouns .......................................................................... 61
  13.8  Section Titles ...................................................................................... 62
  13.9  Rule of Interpretation ........................................................................... 62

**APPENDIX A – TAX MATTERS**

**EXHIBIT A – MEMBERS**

**EXHIBIT B – SCHEDULE OF G&S LIVINGSTON LIABILITIES**

**EXHIBIT C – LEGAL DESCRIPTION OF THE LIVINGSTON PROPERTY**

**EXHIBIT D – LOAN SALE AGREEMENT**

**EXHIBIT E – MANAGEMENT AGREEMENT**

**EXHIBIT F – SCHEDULE OF ENCUMBRANCES ON THE LIVINGSTON PROPERTY**

US_ACTIVE-103768707.25

# AMENDED AND RESTATED

## OPERATING AGREEMENT

### OF

### DAVEN AVENUE, LLC

This Amended and Restated Operating Agreement of Daven Avenue, LLC, a Delaware limited liability company (the "**Company**") is made and entered into as of _____ \_\_, 201\_ (the "**Effective Date**") by and among G & S Livingston Realty Inc., a New Jersey corporation ("**G&S Livingston**") and KABR Real Estate Investment Partners, LLC, a Delaware limited liability company ("**KABR**") for the purpose of amending and restating the operating agreement of the Company dated _____ \_\_, 201\_:

### WITNESSETH

**WHEREAS,** G&S Livingston is the sole owner of the Livingston Property (as defined below) and such property is encumbered by the Existing Loan (as defined below);

**WHEREAS,** G&S Livingston has negotiated an understanding with the Securitization Administrator (as defined below) whereby the Existing Loan could be purchased for significantly less than the face amount of such indebtedness;

**WHEREAS,** pursuant to the Restructuring Support Agreement (as defined below) and as reflected in the Plan of Reorganization (as defined below), KABR agreed with G&S Livingston that KABR would form and capitalize an entity, Essex (as defined below), to purchase the Existing Loan, and Essex and KABR would, upon such purchase, grant waivers to G&S Livingston to enter into the Title 11 Bankruptcy (as defined below), allow the Livingston Property to be contributed to the Company and agree to forgo any claims or remedies under the

1

Existing Loan, including the waiver of guaranties and the collection of any interest due, for the pendency of the Title 11 Bankruptcy;

**WHEREAS**, as part of the aforementioned Restructuring Support Agreement and pursuant to the Plan of Reorganization and subject to the approval of the Bankruptcy Court (as defined below), the parties also agreed that G&S Livingston would form the Company through a contribution of cash and the Livingston Property, subject to the Existing Loan and the G&S Livingston Liabilities (as defined below), and Essex and the Company would undergo the Bankruptcy Merger (as defined below).

**WHEREAS,** such Bankruptcy Merger would result in the Company, using a portion of the cash contributed by G&S Livingston, to retire a portion of the Existing Loan with the balance of the Existing Loan being forgiven in exchange for an ownership interest in the Company;

**WHEREAS**, after such Bankruptcy Merger, KABR and G&S Livingston would each make capital contributions equal to fifty percent (50%) of the outstanding amount of the G&S Livingston Liabilities plus five hundred thousand dollars ($500,000);

**WHEREAS**, Essex was formed by KABR and capitalized with approximately thirteen million dollars ($13,000,000) of cash;

**WHEREAS**, Essex executed the Loan Sale Agreement (as defined below) pursuant to which the Essex purchased the Existing Loan for $13,000,000;

**WHEREAS**, on the Petition Date (as defined below), G&S Livingston entered in the Title 11 Bankruptcy; and

**NOW THEREFORE**, pursuant to the terms, covenants and conditions set forth herein and in consideration of the mutual promises contained herein, the Members and the Company, intending to be legally bound, hereby agree as follows:

US_ACTIVE-103768707.25

# ARTICLE ONE
# DEFINED TERMS

## 1.1   Defined Terms

The defined terms used in this Agreement, unless otherwise expressly defined herein, shall have the meanings specified in this Article One.

(1)   "**Act**" means the Delaware Limited Liability Company Act, 6 Del. C §18-101, et. seq., as amended from time to time (or the corresponding provisions of any succeeding law).

(2)   "**Adjusted Percentage Interest**" initially means fifty percent (50%) to KABR and fifty percent (50%) to G&S Livingston.

(3)   "**Additional Capital Contributions for Operations and Capital Improvements**" means the additional contributions of capital to the Company for the purposes stated in Section 3.1D.

(4)   "**Affiliate**" means, when used with reference to a specified Person, any Person directly or indirectly controlling, controlled by or under common control with, the specified Person.

(5)   "**Agreement**" means this Amended and Restated Operating Agreement of Daven Avenue, LLC as it may be amended or modified from time to time in accordance with its terms.

(6)   "**Annual Budget**" means an annual budget prepared or caused to be prepared by the Managing Agent and approved in writing by KABR and G&S Livingston setting forth the estimated capital and operating expenses of the Company and the Livingston Property for the applicable Fiscal Year and for each month and each calendar quarter of such Fiscal Year.

(7)   "**Bankruptcy**" means, other than the Title 11 Bankruptcy, the: (a) filing of an application by a Member for, or his, her or its consent to, the appointment of a trustee, receiver or custodian of all or a substantial portion of such Member's assets; (b) entry of an order for

US_ACTIVE-103768707.25

relief with respect to a Member in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time; (c) making by a Member of a general assignment for the benefit of creditors; (d) entry of an order, judgment or decree by any court of competent jurisdiction appointing a trustee, receiver or custodian of all or a substantial portion of the assets of a Member (without such Member's consent) unless the proceedings and the person appointed are dismissed within ninety (90) days; or (e) failure by a Member generally to pay his, her or its debts as those debts become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of his or her inability to pay his or her debts as they become due.

(8)    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York which has jurisdiction of the Title 11 Bankruptcy under the petition filed to such court by G&S Livingston as of the Petition Date.

(9)    "**Bankruptcy Merger**" means the merger of Essex with and into the Company with the Company surviving pursuant to the Plan of Reorganization and the Restructuring Support Agreement whereby the one million, nine hundred and fifth thousand dollars ($1,950,000) of cash contributed as part of G&S Livingston's Initial Capital Contribution is used to retire fifteen percent (15%) of the Existing Loan (with such one million, nine hundred and fifth thousand dollars ($1,950,000) of cash being distributed to KABR as part of such Bankruptcy Merger) and then the balance of such loan is forgiven in exchange for eleven million and fifty thousand dollars ($11,050,000) equity interest of the Company as reflected in this Agreement.

(10)    "**Capital Contributions for Operations and Capital Improvements**" means (a) all Initial Capital Contributions for Operations and Capital Improvements pursuant to Section

US_ACTIVE-103768707.25

3.1A, (b) all Additional Capital Contributions for Operations and Capital Improvements pursuant to 3.1D and (c) all other contributions of capital to the Company, other than Initial Capital Contributions.

(11)   **"Capital Proceeds"** means funds of the Company, arising from a Capital Transaction, less: (a) the actual costs incurred by the Company with third parties in consummating such Capital Transaction, (b) the amount of any loans repaid from such funds, and (c) reserves approved by the Managers in amounts reasonably estimated to be required to pay Company expenses.

(12)   **"Capital Transaction"** means the sale, financing, refinancing or similar transaction of, or involving any part or all of, the Company's assets (including condemnation awards, payment of title insurance proceeds or casualty loss insurance proceeds other than business interruption or rental loss insurance proceeds, to the extent such awards and proceeds are not applied to mortgage indebtedness of the Company and not used to repair damage caused by a casualty or taking or in alleviation of any title defect).

(13)   **"Carried Interest"** means the right by Joseph Lobuono to receive distributions pursuant to Section 8.1D, adjusted from time to time pursuant to this Agreement, for advice, consulting services and facilitating the consummation of this Agreement.

(14)   **"Certificate"** means the Certificate of Formation of the Company filed with the Secretary of the State of Delaware as part of the formation of the Company.

(15)   **"Closing Costs"** means as of the Effective Date the following expenses paid by KABR and/or G&S Livingston: (a) all reasonable out-of-pocket costs incurred in connection with the formation of the Company, (b) the cost of any title insurance, recording and filing fees and a survey update, (c) transfer taxes, if any, (d) reasonable legal fees and disbursements

US_ACTIVE-103768707.25

incurred by KABR and G&S Livingston in connection with the preparation, review and negotiation of the documents executed in connection with purchase of the Existing Loan, (e) actual third party costs and expenses incurred by or on behalf of KABR for KABR's due diligence of the Livingston Property, including the reasonable fees for zoning, environmental, architectural and engineering consultants, (f) any liabilities in the ordinary course arising out of or related to the Livingston Property and G&S Livingston's business attributable to such Livingston Property accrued after October 26, 2010 and paid prior to the Effective Date, (g) G&S Livingston Liabilities, as reflected in the schedule attached as **Exhibit B,** which were paid between October 26, 2010 and the Effective Date and (e) legal fees and disbursements incurred by KABR and G&S Livingston in connection with the preparation and negotiation of (i) this Agreement, (ii) the Management Agreement, (iii) any applicable Title 11 Bankruptcy costs and (iv) the Restructuring Support Agreement.

(16)    "**Code**" means the Internal Revenue Code of 1986, as amended from time to time (or the corresponding provision of any succeeding law).

(17)    "**Control**" means direct or indirect ownership of more than fifty percent (50%) of the equity of the Company.

(18)    "**Company**" means of Daven Avenue, LLC, a limited liability company organized under the laws of the State of Delaware, as said Company may from time to time be constituted.

(19)    "**Consulting Fee**" means the fee due to Rapad Management, LLC, a New Jersey limited liability company, on a per annum basis equal to one percent (1%) of the Company's gross revenues.

US_ACTIVE-103768707.25

(20)   **"CVS Litigation"** means the lawsuit filed by G&S Livingston against CVS to enforce the guaranty made by CVS's predecessor, Melville Corporation, to G&S Livingston with respect to the lease for the Livingston Property granted by G&S Livingston to Linens 'n Things.

(21)   **"CVS Proceeds"** means the net proceeds actually received which result from the final outcome of the CVS Litigation either from a binding judicial decision or settlement.

(22)   **"Disequilibrium Amount"** means the amount of KABR's Unrecovered Capital to the extent that such Unrecovered Capital is in excess of seventy percent (70%) of the Members' total amount of Unrecovered Capital.

(23)   **"Dissociation"** means the Bankruptcy, death, dissolution, expulsion, incapacity or withdrawal of any Member or any other event that causes a Member to cease to be a Member under the Act.

(24)   **"Emergency Situation"** means a situation impairing or imminently likely to impair structural support of any portion of the Livingston Property or causing or imminently likely to cause bodily injury to persons or physical damage to any part of the Livingston Property or any property in, on, under, within, upon or adjacent to the Livingston Property and which could affect the Livingston Property or causing or imminently likely to cause substantial economic loss to the Company.

(25)   **"Essex"** means Essex Ten Financial, LLC, a New Jersey limited liability company.

(26)   **"Existing Loan"** means the twenty eight million, one hundred and twenty five thousand dollar ($28,125,000) loan which is secured by a mortgage on the Livingston Property and reflected in the Loan Agreement dated July 14, 2005 between G&S Livingston, as Borrower, by Barclays Capital Real Estate, Inc. as the initial Lender.   Such loan was subsequently

7

securitized and sold to the registered holders of Banc of America Commercial Mortgage Inc.,

Commercial Mortgage Pass-Through Series Certificates Series 2005-5.

(27)    **"Fiscal Year"** means the Company's fiscal year which shall be the calendar year.

(28)    **"G&S Livingston"** shall have the meaning in the preamble hereto.

(29)    **"G&S Livingston's Group"** shall have the meaning set forth in Section 6.2A of

this Agreement.

(30)    **"G&S Livingston Liabilities"** means (a) all unpaid liabilities reflected on the

schedule attached as **Exhibit B** accrued as of October 25, 2010 and adjusted for any other unpaid

liabilities accrued in the ordinary course from October 26, 2010 until the Effective Date arising

out of or relating to the Livingston Property and G&S Livingston's business attributable to such

Livingston Property which shall be paid in full as part of the Title 11 Bankruptcy, other than the

Existing Loan and any counterclaim raised as part of the CVS Litigation, and (b) all of G&S

Livingston's Closing Costs which were not paid or settled on or prior to the Effective Date.

(31)    **"Indemnitee"** shall have the meaning set forth in Section 6.5A of this Agreement.

(32)    **"Indirect Interest"** shall have the meaning set forth in Section 7.1 of this

Agreement.

(33)    **"Initial Capital Contributions"** means for KABR the forgiveness and

capitalization of eleven million and fifty thousand dollars ($11,050,000) of the Existing Loan as

part of the Bankruptcy Merger and for G&S Livingston (a) the Livingston Property, subject to

the Existing Loan and the G&S Livingston Liabilities, (b) one million, nine hundred and fifth

thousand dollars ($1,950,000) and (c) the claim underlying the CVS Litigation.  Such Initial

Capital Contributions and the initial Unrecovered Capital, after the Bankruptcy Merger, shall be

valued at eleven million and fifty thousand dollars ($11,050,000) for KABAR and one million,

nine hundred and fifth thousand dollars ($1,950,000) for G&S Livingston and shall exclude any Capital Contributions for Operations and Capital Improvements.

(34)    "**Initial Capital Contributions for Operations and Capital Improvements**" means a contribution of cash, pursuant to the Plan of Reorganization and after the Bankruptcy Merger, by each of KABR and G&S Livingston equal to fifty percent (50%) of the G&S Livingston Liabilities plus five hundred thousand dollars ($500,000).

(35)    "**Interim Loan**" means the recourse or nonrecourse loan anticipated to be made to the Company as borrower, secured by the Livingston Property, from an institutional lender at market terms and rates with a principal amount which is anticipated to be not less than six million, five hundred thousand dollars ($6,500,000).

(36)    "**IRS**" means the Internal Revenue Service.

(37)    "**IRS Notice**" shall have the meaning set forth in Sections 3.2C(ii) of this Agreement.

(38)    "**KABR**" shall have the meaning in the preamble hereto.

(39)    "**KABR's Group**" shall have the meaning set forth in Section 6.2A of this Agreement.

(40)    "**KABR Management**" means KABR Management, LLC a Delaware limited liability company.

(41)    "**Livingston Property**" means the land, together with the fixtures and improvements now or hereafter thereon located on Route 10 in Livingston, New Jersey and as of the date hereof known as the Daven Avenue Shopping Center and comprising of 121,879 square feet of rentable space, and all appurtenances thereto as reflected in the legal description attached as **Exhibit C**.

US_ACTIVE-103768707.25

(42)    "**Loan Sale Agreement**" means the agreement between the Essex and LaSalle Bank National Association, as trustee and REMIC administrator for the registered holders of Banc of America Commercial Mortgage Inc., Commercial Mortgage Pass-Through Series Certificates Series 2005-5, regarding the acquisition of the Existing Loan by Essex which is substantially similar to the agreement attached as **Exhibit D**.

(43)    "**Managing Agent**" initially means Willow Park Enterprises, Inc. or such other Person acting in such capacity pursuant to the Management Agreement or such other Person as may be selected in accordance with the terms hereof for provision of the property management and leasing services with respect to the Livingston Property.

(44)    "**Managing Agreement**" means the agreement between the Company and the Managing Agent, as amended from time to time attached as **Exhibit E**.

(45)    "**Managers**" mean G&S Livingston and KABR Management and/or such other Persons who are subsequently appointed as a Manager or Co-Manager of the Company in accordance with the terms of this Agreement.

(46)    "**Members**" means those Persons listed on **Exhibit A** hereto as such **Exhibit A** may be amended from time to time.

(47)    "**Member's Family**" shall have the meaning set forth in Sections 7.2 of this Agreement.

(48)    "**Membership Interest**" means the interest in the Company owned by a Member.

(49)    "**Net Cash Flow From Operations**" means the gross cash proceeds from the Company's operations (including sales and dispositions in the ordinary course of business) less the portion thereof used to pay or establish reserves for all Company expenses, debt payments, capital improvements, replacements, and contingencies, all as determined by the Managers. "Net

US_ACTIVE-103768707.25

Cash Flow from Operations" shall not be reduced by Depreciation, amortization, cost recovery deductions, or similar allowances, but shall be increased by any reductions of reserves previously established.

(50)    "**New Membership Interests**" shall have the meaning set forth in Section 7.4 of this Agreement.

(51)    "**Non-Discretionary Expenses**" means approved operating expenses, the payment and amount of which are not within the discretion of the Company or the Managers, including, without limitation, real estate taxes and assessments, insurance, debt service, utility costs and fee escalations in service agreements entered into in accordance with this Agreement.

(52)    "**Notification**" means a writing containing the information required by this Agreement to be communicated to a Person in the manner provided in Section 13.1 below of this Agreement.

(53)    "**Offeror Notice**" shall have the meaning set forth in Sections 7.1 of this Agreement.

(54)    "**Operating Preferred Return**" means a sum equal to eight percent (8%) per annum of the Operations Unrecovered Capital, determined on the basis of a year of 365 or 366 days, as the case may be, for the actual number of days in the period for which the Operations Preferred Return is being determined, cumulative and compounded to the extent not distributed in any fiscal quarter pursuant to 8.1A, of the average daily balance of the aggregate Capital Contributions for Operations and Capital Improvements of the Members from time to time during the period to which the Operations Preferred Return relates, commencing on the first date any Member is admitted to the Company and excluding any Preferred Return.

11

(55)   **"Operating Unrecovered Capital"** means for each Member, such Member's Capital Contributions for Operations and Capital Improvements less any aggregate amounts previously received pursuant to Section 8.1D of this Agreement.

(56)   **"Other Members"** shall have the meaning set forth in Section 7.1 of this Agreement.

(57)   **"Percentage Interest"** such term shall initially mean forty seven point five percent (47.5%) to KABR, forty seven point five percent (47.5%) to G&S Livingston and five percent (5%) to Joseph Lobuono.  Such Percentage Interests shall be as adjusted from time to time.

(58)   **"Permitted Transferee"** shall have the meaning set forth in Sections 7.2 of this Agreement.

(59)   **"Permitted Transferee of a Membership Interest"** shall have the meaning set forth in Sections 7.2 of this Agreement.

(60)   **"Person"** means, without limitation, any individual, executor, administrator, representative, corporation, limited liability company, partnership, trust, unincorporated organization or association, or other entity.

(61)   **"Petition Date"** means the date on which G&S Livingston shall have commenced the Title 11 Bankruptcy in the Bankruptcy Court.

(62)   **"Plan of Reorganization"** means the prearranged title 11 plan of reorganization for G&S Livingston filed with and approved by the Bankruptcy Court as part of the Title 11 Bankruptcy.

(63)   **"Preferred Return"** means a sum equal to eight percent (8%) per annum of the Unrecovered Capital, determined on the basis of a year of 365 or 366 days, as the case may be,

US_ACTIVE-103768707.25

for the actual number of days in the period for which the Preferred Return is being determined, cumulative and compounded to the extent not distributed to the Members in any fiscal quarter pursuant to 8.1A, of the average daily balance of the aggregate Initial Capital Contributions of the Members from time to time during the period to which the Preferred Return relates, commencing on the first date any Member is admitted to the Company and excluding any Operating Preferred Return.

(64)   **"Rappaport"** means Laurence J. Rappaport with an address of c/o KABR Real Estate Investment Partners, LLC, Suite 220, 10 Forest Ave., Paramus, NJ 07652.

(65)   **"Regulations"** means the temporary or final regulation(s), promulgated pursuant to the Code by the United States Department of the Treasury, as such regulations may be amended from time to time, and any successor regulation(s).

(66)   **"Restructuring Support Agreement"** means the agreement dated [October 27, 2010] between KABR and G&S Livingston regarding the obligations and requirements of each of such entities with respect to the acquisition of the Existing Loan, the entering of G&S Livingston into the Title 11 Bankruptcy, the effectuation of the Bankruptcy Merger, the Initial Capital Contributions for Operations and Capital Improvements by each of such entities and certain other rights and responsibilities reflected in this Agreement.

(67)   **"Rollover Budget"** shall have the meaning set forth in Sections 6.4B of this Agreement.

(68)   **"Safe Harbor Election"** shall have the meaning set forth in Sections 3.2C(ii) of this Agreement.

US_ACTIVE-103768707.25

(69)   **"Securitization Administrator"** means LaSalle Bank National Association, as trustee and REMIC administrator for the registered holders of Banc of America Commercial Mortgage Inc., Commercial Mortgage Pass-Through Series Certificates Series 2005-5.

(70)   **"Subscription Notice"** shall have the meaning set forth in Section 7.4 of this Agreement.

(71)   **"Subscription Period"** shall have the meaning set forth in Section 7.4 of this Agreement.

(72)   **"Term"** shall have the meaning set forth in Section 2.4 of this Agreement.

(73)   **"Title 11 Bankruptcy"** means the Bankruptcy proceeding under title 11 of the United States Bankruptcy Code entered into by G&S Livingston with the permission of KABR and Essex.

(74)   **"Transfer"** means, as a noun, any voluntary or involuntary transfer, sale, pledge, hypothecation, or other disposition or encumbrance, and, as a verb, voluntarily or involuntarily to transfer, sell, pledge, hypothecate or otherwise dispose of or encumber.

(75)   **"Traub"** means Lawrence Traub with an address of 225 South Pitt Street, Alexandria, VA 22314.

(76)   **"Unrecovered Capital"** means for each Member, such Member's Capital Contribution less any aggregate amounts previously received pursuant to Section 8.1 of this Agreement.  The initial Unrecovered Capital for each Member, after the Bankruptcy Merger, shall equal eleven million and fifty thousand dollars ($11,050,000) for KABAR and one million, nine hundred and fifth thousand dollars ($1,950,000) for G&S Livingston.

(77)   **"Wasser"** means Gregg Wasser with an address of c/o G&S Investors, 211 E. 43rd Street, 25th Floor, New York, NY 10017.

US_ACTIVE-103768707.25

## ARTICLE TWO
## NAME; PLACE OF BUSINESS AND OFFICE; PURPOSE; TERM

2.1   **Formation of Company**

The Company was formed as a Delaware limited liability company pursuant to and in accordance with the provisions of the Act.

2.2   **Name; Place of Business and Office**

The name of the Company is Daven Avenue, LLC.  The principal office and place of business of the Company shall be located at 211 E. 43rd Street, 25th Floor, New York, NY 10017.  The Managers may at any time change the location of such principal office and may establish such additional offices as they may deem advisable.  The Company may do business under such other name or names as the Managers deem advisable.  The Managers shall advise the Members of any change in such principal office or change in the name of the Company within a reasonable time following such change.

2.3   **Purpose**

The purposes of the Company are to (A) effectuate the Bankruptcy Merger, (B) to own, hold, lease, operate, maintain, manage, finance, refinance, invest in, sell, and otherwise use or deal with the Livingston Property for profit and as an investment, (C) do any and all other acts or things which may be incidental or necessary to carry on the business of the Company as contemplated in the preceding subclauses (A) and (B) and (C) pursue the CVS Litigation until a final adjudication has or occurred of a final settlement has been reached.  In no event shall the business of the Company be extended beyond the foregoing matters described herein unless otherwise approved by the Members.

US_ACTIVE-103768707.25

2.4    **Term**

The Company began on the date the Certificate was filed in the office of the Secretary of

State of Delaware and shall continue until terminated as herein provided ("**Term**").

2.5    **Members**

The Members as of the date hereof shall be the Members listed on **Exhibit A** attached

hereto.

## ARTICLE THREE
## CAPITAL

3.1    **Capital Contributions**

A.    **Initial Capital Contributions**. Subject to the terms and conditions of this

Agreement, Pursuant to the Plan of Reorganization and as part of the Bankruptcy Merger, G&S

Livingston, KABR and the Company hereby make the Initial Capital Contributions and the

Initial Capital Contributions for Operations and Capital Improvements.  As of the Effective Date

and after the Bankruptcy Merger, the Members' Initial Capital Contributions shall be valued at

eleven million and fifty thousand dollars ($11,050,000) for KABR and one million, nine hundred

and fifth thousand dollars ($1,950,000) for G&S Livingston as such the initial Unrecovered

Capital for KABR shall be eleven million and fifty thousand dollars ($11,050,000) and the initial

Unrecovered Capital for G&S Livingston shall be one million, nine hundred and fifth thousand

dollars ($1,950,000).

B.    **Initial Capital Contributions for Operations and Improvements.**  Pursuant to

the Plan of Reorganization and after the Bankruptcy Merger, KABR and G&S Livingston shall

each contribute the Initial Capital Contributions for Operations and Capital Improvements in

accordance with their Adjusted Percentage Interest.  As of the date hereof, the Members estimate

US_ACTIVE-103768707.25

that the Initial Capital Contributions for Operations and Capital Improvements shall be six hundred and thirteen thousand, thirty dollars and twenty seven cents ($613,030.27) for KABR and six hundred and thirteen thousand, thirty dollars and twenty seven cents ($613,030.27) for G&S Livingston.  The precise amount of the Initial Capital Contributions for Operations and Capital Improvements will be determined immediately prior to the signing of this Agreement.  As a result of the foregoing, the initial Operating Unrecovered Capital for KABR and G&S Livingston shall equal the precise amounts contributed pursuant to this Section 3.1B.

C.    **Closing Costs.**  All Closing Costs incurred by KABR or its Affiliates and/or G&S Livingston or its Affiliates during the period prior to the consummation of this Agreement shall be borne by such Members until the Effective Date, at which time such Members shall reconcile the Closing Costs borne by each of such Members with their respective Adjusted Percentage Interests, and if the Closing Costs borne by one of such Members exceed such Member's Adjusted Percentage Interest of the Closing Costs, then such Member shall be reimbursed by the other Member for the amount of such excess so that each Member shall bear its Adjusted Percentage Interest of the Closing Costs.

D.    **Additional Capital Contributions for Operations and Capital Improvements**.  The Members shall fund Additional Capital Contributions for Operations and Capital Improvements in accordance with their Adjusted Percentage Interest to fund (i) amounts required under the terms and provisions of each Annual Budget approved in accordance with this Agreement, (ii) amounts required to address an existing Emergency Situation, (iii) costs attributable to the CVS Litigation, and (iv) any other purposes agreed upon by the Members.  Either Member, by written notice to the other Member pursuant to Section 3.1E, may call for

US_ACTIVE-103768707.25

additional capital contributions for application as provided in the preceding sentence, subject, however, to the provisions of Section 6.3B.

E.   **Calls for Additional Capital Contributions for Operations and Capital Improvements**.   In order to call for any Capital Contributions for Operations and Capital Improvements in accordance with Section 3.1D to the extent such call is reflected in an approved Annual Budget and subject to the exclusions under Section 6.3B(ix), the Managers or Members shall deliver a Notification to the other Members calling for the additional Capital Contributions for Operations and Capital Improvements, indicating the respective amounts of the Members' required Capital Contributions for Operations and Capital Improvements, the basis for such call and the date (but in no event earlier than the tenth (10th) day after receipt of such notice) by which the Members shall be required to make their Capital Contributions for Operations and Capital Improvements, and each Member shall be required to contribute its full share of the aggregate Capital Contributions for Operations and Capital Improvements by the date specified. In the event a call for any Capital Contributions for Operations and Capital Improvements are not reflected in an approved Annual Budget, such Capital Contribution for Operations and Improvements must, in addition to the foregoing requirements of this Section 3.1E with respect to Notification, be unanimously approved by the Managers. All calls for Capital Contributions for Operations and Capital Improvements in accordance with this Section 3.1E are mandatory.

F.   **Failure to Make Mandatory Additional Capital Contributions for Operations and Capital Improvements**.   If any Member fails, in whole or in part, to make such Member's Additional Capital Contributions for Operations and Capital Improvements as required by this Agreement, such Member is in default of this Agreement and the contributing Members, on behalf of the Company, shall have all rights at law or equity with respect to the non

18

contributing or partially contributing Member and the Company and the non or partially contributing Members may not prevent the admission of new Members to make the capital contribution to be made by the non contributing Member subject to and in accordance with Section 7.4 (i.e., the Pre-emptive Rights provision of this Agreement).   However, to the extent a contributing Member contributes the amount that the non or partially contributing Member was required to contribute and in lieu of any legal or equitable remedy against the non or partially contributing Member by any Person described in this Section 3.1F (including the admission of new Members pursuant to Section 7.4), such contributing Member shall be distributed, pursuant to Article Eight, two hundred percent (200%) of the additional amount contributed under this Section 3.1F from the amount that otherwise would have been distributed to the non or partially contributing Member pursuant to Article Eight.   Such two hundred percent (200%) shall be distributed in full prior to the non contributing Member receiving any distributions pursuant to Article Eight.

3.2    **Capital Accounts; Allocations; Other Matters Pertaining to Capital**

A.    **Capital Accounts**.   A Capital Account shall be established for each Member. Capital Accounts will be maintained in accordance with this Agreement and Appendix A, attached hereto and incorporated by reference into this Agreement.   A transferee of any Member's Membership Interests shall succeed to the Capital Account associated with such Membership Interests. All Initial Capital Contributions and Capital Contributions for Operations and Capital Improvements will be credited to the Members' respective Capital Accounts in accordance with the terms hereof.

B.    **Allocations**. Except as expressly provided for in Appendix A, for purposes of determining Capital Account balances under this Section 3.2B, Profit and Loss with respect to

US_ACTIVE-103768707.25

any Company Fiscal Year shall be allocated prior to reducing Capital Accounts by any distributions with respect to such Company Fiscal Year. For purposes of applying this Section 3.2B, a Member's Capital Account balance shall be deemed to be increased by such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain determined as of the end of such Company Fiscal Year which shall be taken into account prior to any other allocations pursuant to this Section 3.2B.

     (i)    <u>Profit</u>. For each Company Fiscal Year, Profit shall be allocated among the Members as necessary to cause the Capital Account balance of each Member to equal the sum of (a) the amount of Net Cash Flow from Operations and Capital Proceeds that would be distributed to such Member under Article Eight with respect to such Company Fiscal Year if the Company applied and/or distributed all of the Net Cash Flow from Operations and Capital Proceeds for such Company Fiscal Year pursuant Article Eight, plus (b) the amount that would be distributed to such Member if the Company then sold all of its remaining assets for their adjusted tax basis (or adjusted book basis in the case of property revalued at Gross Asset Value) (except that any Company asset that is realized in such Fiscal Year shall be treated as if sold for an amount of cash equal to the sum of any net cash proceeds and the fair market value of any property actually received by the Company in connection with such disposition) and applied and distributed the proceeds therefrom and its reserves (net of debt repayments) to the Members pursuant to Section 9.2.

     (ii)    <u>Loss</u>. For each Company Fiscal Year from the Effective Date until the termination of the Company, Net Loss shall be allocated among the Members in the following order of priority:

(1)    First, among the Members as necessary to cause each Member's Capital Account balance to equal the sum of (a) the amount of Net Cash Flow from Operations that would be distributed to such Member pursuant to Article Eight with respect to such Company Fiscal Year if the Company applied and/or distributed all of the Net Cash Flow from Operations for such Company Fiscal Year pursuant to Article Eight, plus (b) the amount that would be distributed to such Member if the Company then sold all of its remaining assets for their adjusted tax basis (or adjusted book basis in the case of property revalued at Gross Asset Value) (except that any Company asset that is realized in such Fiscal Year shall be treated as if sold for an amount of cash equal to the sum of any net cash proceeds and the fair market value of any property actually received by the Company in connection with such disposition) and applied and distributed the proceeds therefrom and its reserves (net of debt repayments) to the Members pursuant to Section 9.2; and

(2)    Second, after giving effect to the allocations made pursuant to clause (i), among the Members in proportion to the Members' respective Capital Accounts.

C.    **Carried Interest**.

(i)    The Carried Interest or any future carried interests is or may be granted in exchange for services provided or to be provided to the Company. Consistent with the foregoing, the Carried Interest and any future carried interest are intended to be treated as "profits interests" under IRS Revenue Procedure 93-27 and IRS Revenue Procedure 2001-43 and the provisions hereof shall be interpreted and applied consistently therewith.

21

If a carried interest is issued after the Effective Date, then the Mangers may make appropriate adjustments to the terms of such carried interest in order for such carried interest to be treated as a "profits interest" as described in the immediately preceding sentence, including establishing a benchmark amount of cumulative distributions that must be made with respect to outstanding Membership Interests immediately prior to the issuance of such carried interest before such carried interest is entitled to receive any distributions and/or adjusting the benchmark amount in respect of such carried interest

(ii)    Each Member hereby authorizes and directs the Company to make an election (the "**Safe Harbor Election**") to value the Carried Interest and any future carried interests issued by the Company as compensation for services at liquidation value as the same may be permitted pursuant to or in accordance with temporarily or finally promulgated successor rules to proposed Regulations Section 1.83-3(l) and the proposed Revenue Procedure set forth in IRS Notice 2005-43 (the "**IRS Notice**"). For purposes of making such Safe Harbor Election, the tax matters partner is hereby designated as the "partner who has responsibility for federal income tax reporting" by the Company and, accordingly, execution of such Safe Harbor election by the tax matters partner constitutes execution of a "Safe Harbor Election" in accordance with Section 3.03(1) of the IRS Notice. The Company and each Member shall comply with all requirements of the Safe Harbor Election described in the IRS Notice, including the requirement that each Member prepare and file all federal income tax returns reporting the income tax effects of each interest in the Company issued by the Company covered by the Safe Harbor Election in a manner consistent with the requirements of the IRS Notice.

US_ACTIVE-103768707.25

(iii)    Each Member hereby authorizes the Tax Matters Member to amend this Agreement to the extent necessary to achieve substantially the same tax treatment with respect to any interest in the Company transferred to a service provider by the Company in connection with services provided to the Company as set forth in Section 4 of the IRS Notice (e.g., to reflect changes from the rules set forth in the IRS Notice in subsequent IRS guidance), provided that such amendment is not materially adverse to such Member (as compared with the after-tax consequences that would result if the provisions of the IRS Notice applied to all interests in the Company transferred to a service provider by the Company in connection with services provided to the Company). A Member's obligations to comply with the requirements of this Section 3.2C(iii) shall survive such Member's ceasing to be a Member of the Company and/or the termination, dissolution, liquidation and winding up of the Company, and, for purposes of this Section 3.2C(iii), the Company shall be treated as continuing in existence.

D.    **Partnership Classification for Federal Income Tax Purposes**.  Each Member recognizes, agrees, and intends that for federal income tax purposes the Company will be classified as a partnership.

**ARTICLE FOUR
COVENANTS, REPRESENTATIONS AND WARRANTIES**

4.1    **Covenants, Representations and Warranties of G&S Livingston and the Company**. G&S Livingston and the Company do hereby covenant, warrant and represent that, as of the date of this Agreement:

A.    G&S Livingston and the Company have all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby.

23

B.      All acts and other proceedings required to be taken by G&S Livingston and the Company to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and properly taken.

C.      This Agreement has been duly executed and delivered by G&S Livingston and the Company and constitutes the valid and binding obligation of G&S Livingston and the Company, enforceable against it in accordance with its terms, except as may be limited by Bankruptcy, insolvency and other similar laws and general equitable principles.

D.      G&S Livingston and the Company have obtained all approvals and consents required to be obtained by it in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby from all governmental authorities having any approval rights with respect thereto, and all Persons having consent rights, such that the failure to consent would have a material, adverse effect on the Company or its assets.

E.      G&S Livingston and the Company have good and marketable title to the Livingston Property, free and clear of all liens except for the Existing Loan and the encumbrances listed on **Exhibit F**.

F.      G&S Livingston and the Company have not leased or otherwise granted to any person the right to use or occupy any portion of the Livingston Property.

G.      G&S Livingston and the Company have not granted any outstanding options, rights of first offer or rights of first refusal to purchase the Livingston Property or any portion thereof or interest therein.

H.      There are no adverse parties in possession of the Livingston Property or any material portion thereof

24

I.      Other than the CVS Litigation, there are no pending or, to the knowledge of G&S Livingston or the Company, threatened, condemnation, eminent domain or similar proceedings, or litigation, or other proceedings affecting the Livingston Property.

J.      To the extent required, G&S Livingston hereby covenants to guarantee the Interim Loan and, to the extent the institutional lender of the Interim Loan requires personal guarantees from natural persons, G&S Livingston further covenants that such entity will cause Wasser to make such personal guarantees.

K.      G&S Livingston and the Company hereby covenant to effectuate the Bankruptcy Merger.

4.2     **Covenants, Representations and Warranties of KABR and Essex**.  In addition to the covenants, warranties and representations made elsewhere in this Agreement, KABR and Essex do hereby covenant, warrant and represent that, as of the date of this Agreement:

A.      KABR and Essex have all the requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby.

B.      All acts and other proceedings required to be taken by KABR and Essex to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and properly taken.

C.      This Agreement has been duly executed and delivered by KABR and Essex and constitutes the valid and binding obligation of Essex and KABR, enforceable against it in accordance with its terms, except as may be limited by Bankruptcy, insolvency and other similar laws and general equitable principles.

D.      KABR and Essex have obtained all approvals and consents required to be obtained by such entities in connection with the execution and delivery of this Agreement and

25

the consummation of the transactions contemplated hereby from all governmental authorities having any approval rights with respect thereto, and all Persons having consent rights, such that the failure to consent would have a material, adverse effect on the Company or its assets.

E.      KABR and Essex hereby covenant to effectuate the Bankruptcy Merger.

F.      KABR hereby covenants to use reasonable best and diligent efforts to obtain the Interim Loan.

G.      To the extent required, KABR hereby covenants to guarantee the Interim Loan and, to the extent the institutional lender of the Interim Loan requires personal guarantees from natural persons, KABR further covenants that such entity will cause Rappaport to make such personal guarantees.

## ARTICLE FIVE
## MEMBERS

### 5.1  Limited Liability of Members

Except as required under the Act or as expressly set forth in this Agreement or any other written agreement to which a Member is a party, no Member shall be personally liable for any debt, obligation, or liability of the Company solely by reason of being a Member, whether that liability or obligation arises in contract, tort, or otherwise.

### 5.2  Transactions with the Company

Subject to any terms, conditions or limitations set forth in this Agreement and with the prior approval of the Managers after full disclosure of the Member's involvement, a Member may lend money to, and transact other business with, the Company provided that any such loan or transaction shall be made on terms no less favorable to the Company than if the loan or transaction had been made with an independent third party. Subject to other applicable law, such

US_ACTIVE-103768707.25

Member has the same rights and obligations with respect thereto as a Person who is not a Member.

### 5.3    **Remuneration of Members**

Unless otherwise specifically provided for herein, or pursuant to a separate agreement with the Company, no Member is entitled to remuneration for participating in the Company business.

### 5.4    **Members Are Not Agents**

The management of the Company is vested in the Managers pursuant to Section 6.1 below. No Member (in his, her or its capacity as a Member) is an agent of the Company nor can any Member in such capacity bind or execute any instrument on behalf of the Company.

### 5.5    **Voting Rights**

Except as otherwise required by the Act, only the Managers shall be entitled to vote on matters effecting the business and affairs of the Company and such vote in accordance with their Adjusted Percentage Interests.  In no event shall the holders of the Carried Interest have any voting rights with respect to the Company.

**ARTICLE SIX**
**MANAGEMENT AND CONTROL OF THE COMPANY**

### 6.1    **Management of the Company by the Managers**

A.    Except as otherwise expressly provided herein, the Managers shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.  Provided, however, it is understood that G&S

27

Livingston shall have day to day responsibility for the management, supervision and oversight of the Company and the Livingston Property and shall be able to exercise such power, in its reasonable discretion without the vote or consent of the other Manager(s), subject only to the provisions in 6.3B.  The Company shall pay the Consulting Fee for certain consulting services provided to the Managing Agent and the Company for various matters related to the Livingston Property and the financing and refinancing of the Livingston Property.  Subject to any agreement between the Company and the Managers, the Managers shall devote such time to the Company's business and affairs, as such Managers determine in their sole discretion, as necessary or appropriate to carry out the management responsibilities and duties as Managers of the Company.

  B.  G&S Livingston, as Manager, shall delegate day to day management, supervision and oversight of the Company and the Livingston Property to the Managing Agent pursuant to the Management Agreement attached as **Exhibit E.**

## 6.2 **Appointment of Managers**

  A.  The Company shall have two (2) Managers.  KABR and G&S Livingston shall each appoint or designate a Person to act as Manager and representative of KABR's and G&S Livingston's respective interests in the Company.  KABR hereby appoints KABR Management to act as Manager and G&S Livingston shall itself act as Manager.  For as long as KABR owns a Membership Interest, KABR, KABR's Permitted Transferees of a Membership Interest and transferees and their successors who purchased all or a portion of KABR's Membership Interest pursuant to Section 7.1 ("**KABR's Group**") shall be entitled to appoint or designate one (1) Manager of the Company by majority vote of such group, to the extent applicable.  For as long as G&S Livingston owns a Membership Interest, G&S Livingston, G&S Livingston's Permitted

US_ACTIVE-103768707.25

Transferees of a Membership Interest and transferees and their successors who purchased all or a portion of G&S Livingston's Membership Interest pursuant to Section 7.1 ("**G&S Livingston's Group**") shall be entitled to appoint or designate one (1) Manager of the Company by majority vote, to the extent applicable..

B.      A Manager may resign at any time by giving Notification to the Members without prejudice to the rights or remedies, if any, of the Company under any contract to which the Manager is a party.   The resignation of a Manager shall take effect upon receipt of such Notification or at such later time as shall be specified in the Notification; and, unless otherwise specified in the Notification, the acceptance of the resignation shall not be necessary to make it effective.   The resignation of a Manager shall not affect that Manager's rights as a Member and shall not constitute its withdrawal as a Member.

C.      To the extent that a vacancy occurred for any reason in the office of Manager inclusive of the resignation of one or both Managers and so long as KABR and G&S Livingston own Membership Interests, KABR's Group and G&S Livingston's Group shall each appoint or designate, by majority vote of such groups to the extent applicable, a Person to act as Manager and representative of such Members' interest in the Company in accordance with Section 6.2A.

6.3    **Powers of Managers**

A.      Without limiting the generality of this Article Six, the Managers shall have all necessary powers and authority to manage and carry out the purposes, business, property, and affairs of the Company, including, without limitation, the power to exercise on behalf of the Company all of the powers described in the Act.

US_ACTIVE-103768707.25

B.       Notwithstanding Section 6.3A, the following actions may only be taken upon the written consent of both of the Managers, such approval not to be unreasonably withheld (and any such action taken without both of the Manager's written consent shall be null and void):

(i)       (1) the approval and/or modification of each Annual Budget; (2) approval of any draw request for a capital project or tenant improvement project under the Management Agreement; or (3) the approval, consent or authorization by the Company of unbudgeted expenditures for any particular line item of an Annual Budget in excess of the greater of ten percent (10%) for such line item or twenty thousand dollars ($20,000) (provided that the overall Annual Budget is not increased by more than of ten percent (10%) for the applicable Fiscal Year without the consent of the Managers);

(ii)       the execution or approval of any lease of any part or all of the Livingston Property, the form of lease agreements, guidelines for minimum rental rates, minimum and maximum length of lease terms, brokerage commissions, credit standing of tenants, and approval of any lease amendments which extend the lease term, reduce the rent or give a tenant additional rights or options. Notwithstanding the foregoing, however, the Managing Agent does not need the consent of both Managers for space leases if such leases are on a lease form approved by both Managers and each such lease is for less than 10,000 net rentable square feet to an unrelated third party at terms determined by the Managers in their reasonable business judgment. The Managers shall receive prior written notice of all material terms of a proposed lease and shall receive a copy of each executed lease within thirty (30) days after execution of each lease, whether or not the Manager's consent to a lease is required

US_ACTIVE-103768707.25

(iii)    permitting the Company to engage directly in construction activities (for example, construction of tenant improvements), provided, however, that any project for the Livingston Property which has a budgeted cost of fifty thousand dollars ($50,000) or less is excluded from all of the foregoing approval rights of this Section 6.3B(iii)

(iv)    the settlement or any other material decision with respect to the CVS Litigation or institution, settlement or any other material decision with respect to any other lawsuit, claim, counterclaim or other legal proceeding by or against the Company with an amount at issue or risk in excess of fifty thousand dollars ($50,000) in the aggregate, including without limitation, confessing a judgment against the Company accepting the settlement, compromise or payment of any claim asserted against the Company or any of their respective property and assets (excluding claims covered by the liability insurance policies maintained by the Company or asserted by the Company in respect of the foregoing); provided, however, that all claims, settlements and other decisions relating to (1) a condemnation or proposed condemnation of any land owned by the Company or any portion thereof, (2) any casualty of the Livingston Property, (3) matters in which the Company may admit to criminal liability or penalty, or (4) contesting a legal requirement or insurance requirement rather than complying with the same must all be approved by the Managers regardless of the amount involved;

(v)    the acquisition of any additional real property by the Company (other than the Livingston Property), provided that in no event shall any additional real property be acquired, other than real property which is adjacent to the Livingston Property and is intended to be used in connection with the Livingston Property.

US_ACTIVE-103768707.25

(vi)   the approving of any sale, transfer, exchange, hypothecation or encumbrance of all or any part of the Livingston Property; however, the Managing Agent may make or approve incidental sales, exchanges, conveyances, or transfers of personality or fixtures of the Company in the ordinary course of business if such transaction, together with all other such transactions in the calendar year in question, involves property having a value or sales price of less than fifty thousand dollars ($50,000) in the aggregate;

(vii)   (1) the commitment by the Company to enter into or refinance any loan, other than the Interim Loan; (2) the approval of the loan documents evidencing or securing any such loan; (3) the modification of any such loan or loan documents; or (4) the mortgaging, pledge or encumbrance of all or any part of the Livingston Property or any interest of the Company as security for repayment of any such loan;

(viii)   except as otherwise provided in this Agreement, the selection of the Managing Agent, the cancellation, termination or modification of the Management Agreement or any other property management agreement, leasing agreement or development management agreement, enforcing the Company's rights and remedies thereunder, or entering into a new property management agreement, leasing agreement or development management agreement;

(ix)   the making of calls for any Additional Capital Contributions for Operations and Capital Improvements from Members pursuant to Section 3.1D and Section 3.1E; provided, however, that calls for Additional Capital Contributions for Operations and Capital Improvements in accordance with the terms of an approved Annual Budget or to address an Emergency Situation shall only require the approval of one (1) of the Managers;

32

(x)     changing the nature of the business of the Company or permitting the Company to enter into any business other than or in addition to that contemplated by this Agreement, including any merger or consolidation of the Company with or into any other entity or Person except not including the Bankruptcy Merger; and causing the formation of any corporation or other subsidiary entity owned or controlled by the Company;

(xi)     the filing of a petition for relief under the United States Bankruptcy Code, as amended, with respect to the Company or making an assignment for the benefit of creditors, applying for the appointment of a custodian, receiver or trustee for the Company or any of the Company's property or consenting to any other Bankruptcy or similar proceeding, consenting to the filing of such proceeding or admitting in writing the Company's or inability to pay its debts generally as they become due;

(xii)     the issuance of guaranties or indemnities by the Company of obligations of any Person whether or not in connection with the operation, improvement, management and maintenance of the Livingston Property or in connection with the Interim Loan, and in no event will the Company guaranty any of the obligations of any Affiliate of any Member, except for any indemnification by the Company in favor of KABR Management and G&S Livingston as Managers pursuant to Section 6.5;

(xiii)     the approval of all insurance coverages (except the Managers shall be deemed to have approved the coverages for the Livingston Property so long as such insurance complies with the insurance requirements of an approved loan);

(xiv)     the entering into any agreement with a Manager or an Affiliate of a Manager, except as may be expressly permitted by this Agreement;

US_ACTIVE-103768707.25

(xv)    the approving the admission to the Company of a successor or an additional Member and the terms of the New Membership Interests issued to successor or additional Members unless otherwise permitted to be admitted pursuant to this Agreement pursuant to Section 3.1F, Section 7.1, and Section 7.2;

(xvi)    the approving of any decisions with respect to the liquidation of the Company upon the Company's dissolution pursuant to this Agreement other than those of a ministerial nature;

(xvii)    the amending or terminating the Company's Certificate;

(xviii)    the causing of the Company to make any loans to any Member, any Affiliate of a Member, or any other Person; and

(xix)    the causing of the Company to make any distribution of property in kind to any Member.

6.4    **Annual Budget and Decisions**

A.    G&S Livingston shall prepare and submit, or cause the Managing Agent to prepare and submit, to KABR an Annual Budget for approval as required herein. The initial Annual Budget shall be for the remainder of the Fiscal Year including the Effective Date and shall be provided within thirty (30) days of the Effective Date. An Annual Budget for each subsequent Fiscal Year shall be submitted no later than September 1 of the year prior to the Fiscal Year covered thereby.

B.    KABR shall review each proposed Annual Budget and either approve or disapprove such Budget within thirty (30) days after receipt thereof. If KABR shall disapprove any proposed Annual Budget, KABR shall, within such thirty (30)-day period, submit to G&S Livingston or the Managing Agent proposed modifications to the proposed Annual Budget which

34

will render the same satisfactory to KABR, which proposed modifications shall be subject to the approval of G&S Livingston, together with an explanation of why each such modified item was objectionable. If KABR shall fail to respond to any Annual Budget or any portion thereof prior to expiration of such thirty (30) day period, then such Annual Budget or applicable portion thereof shall be deemed disapproved. If an Annual Budget has not been approved by the commencement of the Fiscal Year covered thereby, then the preceding year's Annual Budget will apply until a new Annual Budget is approved by KABR, subject to (i) actual increases in Non-Discretionary Expenses; (ii) the deletion of non-recurring items other than expenses for non-recurring items that have already been approved by KABR but have not yet been fully performed and/or funded; (iii) individual line items in the proposed Annual Budget that have been approved by KABR; (iv) the Manager's right to expend funds to address an Emergency Situation; and (v) the cost of which the Members expected to be incurred over more than one year (and therefore to be included in more than one Annual Budget), shall also be deemed approved so as to continue to permit the Company to continue to undertake such items (the "**Rollover Budget**"). With respect to all amounts in the Rollover Budget relating to items which have not been adjusted, such aggregate amount shall be increased or decreased in an amount equal to the aggregate amount of such unadjusted items multiplied by the percentage increase or decrease in the consumer price index of Northern New Jersey or any successor index, but in no event will the change in the aggregate amount for unadjusted items be more than ten percent (10%) of the corresponding aggregate amount for such unadjusted items in the Rollover Budget until such time as a new Annual Budget is approved by the Managers. The Managers shall endeavor in good faith to approve an Annual Budget by December 1 of the year prior to the Fiscal Year covered thereby.

US_ACTIVE-103768707.25

C.     Each Annual Budget and any modification thereto, shall be subject to the approval of KABR. Each Annual Budget shall be subject to review at the end of each quarter.

D.     Subject to the variance set forth in Section 6.3B(ix) and Section 6.4B, the Managers shall not expend any amounts not provided for in the then-current Annual Budget approved by KABR, except in an event of an Emergency Situation (and notice of any expenditures made in connection with an Emergency Situation shall promptly be given to the Members) or except as otherwise approved by KABR.

6.5     **Indemnification of Managers and Affiliates**

A.     The Company shall indemnify the Managers, their agents, legal representatives and successors (collectively "**Indemnitee**") and hold each of them harmless from and against any loss, damage, liability or expense ("**Liability**") suffered or incurred by the Indemnitee, or any of them in the course of serving in any office of, or otherwise representing (within the scope of his or its authority) or acting for or on behalf of the Company to the fullest extent allowed by applicable law, except to the extent that a judgment or other final adjudication adverse to the Managers or other Person establishes (i) that his, her or its acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated or (ii) that he, she or it personally gained in fact a financial profit or other advantage to which he, she or it was not legally entitled; provided, however, that, any other provision hereof notwithstanding, any such indemnification shall be solely from the net assets of the Company, and neither any Member nor any Manager shall be required to make any capital contribution or otherwise pay any amount from his own assets as a result thereof. The Company may procure insurance in such amounts and covering such risks as the Managers deem appropriate to fund any indemnification required or permitted to be made hereunder. The

36

US_ACTIVE-103768707.25

Managers shall perform their managerial duties in good faith, in a manner which the Managers reasonably believe to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. The Managers who so perform the duties of a Manager shall not have any liability by reason of being or having been a Manager of the Company.

B.    In performing his, her or its duties, the Managers shall be entitled to rely on information, opinions, reports or statements, including, without limitation, financial statements and other financial data, in each case prepared or presented by agents or employees of the Company, legal counsel, public accountants or other Persons as to matters that the Managers believe to be within such Persons' professional or expert competence, unless the Managers have knowledge concerning the matter in question that would cause such reliance to be unwarranted and provided that such Managers act in good faith and after reasonable inquiry when the need therefore is indicated by the circumstances.

C.    The procedure for indemnification shall be as follows:

(i)    An Indemnitee shall promptly give Notification to the Company and the Managers of any claim for which indemnification is sought, whether between the parties or brought by a third party, specifying (1) the factual basis for such claim and (2) the amount of the claim if determinable. If the claim relates to an action, suit or proceeding filed by a third party against Indemnitee, such Notification shall be given by such Indemnitee within five (5) business days after written notice of such action, suit or proceeding was given to Indemnitee, but failure to give such Notification within such five (5) day period shall not affect the Indemnitee's right to indemnification except to the extent that the defense of the matter by the indemnifying party was prejudiced.

US_ACTIVE-103768707.25

(ii)    Following receipt of Notification from an Indemnitee of a claim which is not a third party claim, the Company shall have thirty (30) days to make such an investigation of the claim as it deems necessary or desirable.  For the purpose of such investigation, the Indemnitee shall make available to the Company and/or its authorized representative(s) the information relied upon by the Indemnitee to substantiate the claim and all other information and documentation reasonably requested by the Company.  If the Indemnitee and the Company agree at or prior to the expiration of said period (or any mutually agreed upon extension thereof) to the validity and amount of such claim, the Company shall immediately pay to the Indemnitee the full amount of the claim.  If the Indemnitee and the Company do not agree within said period (or any mutually agreed upon extension thereof), the Indemnitee may seek appropriate legal remedy.

(iii)    With respect to any claim by a third party as to which the Indemnitee is entitled to indemnification hereunder, the Company shall have the right at its own expense, to participate in or assume control of the defense of such claim, and the Indemnitee shall cooperate fully with the Company, subject to reimbursement for actual out-of-pocket expenses incurred by the Indemnitee as the result of a request by the Company.  The Company shall elect to participate in or assume control of the defense of any such claim within thirty (30) days, or such shorter period as is reasonable under the circumstances, after receipt of Notification from the Indemnitee.  If the Company elects to assume control of the defense of any third-party claim, the Indemnitee shall have the right to participate in the defense of any third-party claim at the Indemnitee's own cost and expense.  If the Company does not elect to assume control or otherwise participate in the defense of any third-party claim, it shall be bound by the results

US_ACTIVE-103768707.25

obtained by the Indemnitee with respect to such claim; provided that the Indemnitee will not settle any claim without the prior consent of the Company which consent shall not be unreasonably withheld or delayed.

(iv)    If a claim, whether between the parties or by a third party, requires immediate action, the parties will make every effort to reach a decision with respect thereto as expeditiously as possible.

## 6.6    **Interested Managers**

A.    Subject to the restrictions contained in this Agreement, a Manager may lend money to, guarantee or act as a surety for, provide collateral for an obligation of and transact other business with the Company and, subject to any applicable law, shall have the same rights and obligations with respect thereto as a Person who is not a Manager.

## 6.7    **Limited Liability of Managers**

The Managers shall not be liable to the Company or any Member for any Liability suffered or incurred by any Person on account of, or by reason of any claim based on or arising from, any act taken or omitted to be taken in the course of representing or performing services for the Company or otherwise in his capacity as Manager including, without limitation, his appointment or retention of, or reliance upon, any employee or agent of the Company, legal counsel, public accountants or other Persons as to matters that the Managers believe to be within such Persons' professional or expert competence, notwithstanding any negligence, fraud or willful misconduct by such employee, agent or Person, except to the extent that a judgment or other final adjudication adverse to him establishes that his acts or omissions were in violation of any provision of this Agreement, or were in bad faith or involved intentional misconduct or a knowing violation of law or that he personally gained in fact a financial profit or other advantage

US_ACTIVE-103768707.25

to which he was not legally entitled or that with respect to a distribution in violation of applicable law or his acts were not performed in accordance with Section 6.5.

### 6.8    Removal of a Manager, the Managing Agent or Termination of a Right to Receive a Consulting Fee

A Manager or the Managing Agent shall be removed and the right to receive a Consulting Fee shall be terminated to the extent that such Manager, Managing Agent or Person receiving a Consulting Fee: (A) commits a criminal act; (B) misapplies any funds derived from the Livingston Property, including security deposits, insurance proceeds or condemnation awards; or (C) commits fraud misrepresentation, gross negligence or willful misconduct.

### 6.9    Tax Matters Partner

G&S Livingston shall be the "tax matters partner" of the Company (as defined in Section 6231(a)(7) of the Code) under Sections 6221 through 6234 of the Code (or successor provisions thereto), and shall have all powers necessary and appropriate in connection therewith including, without limitation, (A) to conduct all audits and other administrative proceedings with respect to Company tax items; (B) to extend the statute of limitations for all Members with respect to Company tax items; (C) to file a petition with an appropriate Federal court for review of a final Company administrative adjustment; and (D) to enter into a settlement with the Internal Revenue Service on behalf of, and binding upon, all of the Members unless a Member notifies the Internal Revenue Service (within the time prescribed by the Code and Regulations) that the tax matters partner may not act on such Member's behalf.  The tax matters partner shall keep each Member informed of all administrative and judicial proceedings as is required by Section 6223(g) of the Code and the Regulations promulgated thereunder.  Notwithstanding any provision in this Agreement to the contrary, the Person serving as the tax matters partner of the Company shall

US_ACTIVE-103768707.25

have the sole authority to act on behalf of the Company in the Company's capacity as the tax

matters partner of any other entity.

### 6.10   **Officers & Employees**

Subject to the Management Agreement, the Company shall not have employees or

officers.

### 6.11   **Tax Status**

The Members intend that the Company shall be treated as a partnership for Federal

income tax purposes.  Neither the Members nor the Managers shall take any action or make any

election that would adversely affect the Company's status as a partnership, without the

unanimous consent of the Members.

**ARTICLE SEVEN**
**TRANSFER OF MEMBERSHIP INTERESTS AND INDIRECT INTEREST**

### 7.1   **Restrictions on Transfer; First Refusal Rights**

Subject to Section 7.2, a Member may not sell or Transfer all or any part of his, her or its

Membership Interest except as provided herein.  In addition, Wasser, Traub and Rappaport may

not sell or Transfer all or any part of their indirect equity interest in G&S Livingston, KABR or

KABR Management as applicable (an "**Indirect Interest**") for a period of three (3) years or

sooner to the extent that substantially all the Livingston Property's leasable space has been

leased to third party tenants and the Company has had positive Net Cash Flow From Operations

for at least four (4) sequential quarters, except as provided herein.  A Member wishing to sell or

Transfer all or any part of his, her or its Membership Interest shall give the Company and the

other Members ("**Other Members**") written notice of his or its intention to do so.  The notice

must name the proposed transferee and specify the purchase price and the other terms of

41

purchase ("**Offeror Notice**"). For a period of sixty (60) days after receipt of the Offeror Notice, the Company shall have a first option to purchase all or a portion of the Membership Interests of the proposed transferor offered for sale for the price and terms set forth in the Offeror Notice. If such purchase option is not exercised by the Company (or if exercised by the Company for less than all the Membership Interests offered for sale) within the sixty (60) day period, then the Other Members shall have a second option to purchase the Membership Interests not purchased by the Company on a pro rata basis predicated on the percentage of Membership Interests owned by each Other Member (or such other basis as agreed to by the Other Members) at the purchase price and upon the terms set forth in the Offeror Notice for a period of thirty (30) days after the expiration of the aforementioned sixty (60) day Company purchase option period, and if some, but not all, of the Other Members exercise the second option, then those Other Members exercising the second option, shall have a further option for a period of thirty (30) days after the expiration of the aforementioned thirty (30) day period to purchase all, but not less than all, of the remaining Membership Interests not previously purchased on a pro rata basis by the non-participating other Members predicated on the percentage of Membership Interests by each such Other Member (or such other basis as agreed upon by them) at a purchase price and upon the terms set forth in the Offeror Notice. If the Company and/or the Other Members fail to exercise the options granted to them hereunder to purchase all, but not less than all, of the Membership Interests offered for sale, then the Membership Interests of the selling Member offered for sale may be Transferred to the prospective purchaser set forth in the aforesaid notice at any time within four (4) months from the date of the Offeror's Notice for the price and subject to the other terms set forth therein. The purchaser shall receive and hold the Membership Interests the purchaser receives, subject to the terms and conditions of this Agreement. If the sale to the

42

US_ACTIVE-103768707.25

prospective purchaser is not consummated within the aforesaid four (4) month period, the Membership Interests offered for sale shall again be subject to the restrictions set forth in this Article Seven.

7.2    **Permitted Transfer.**

A Member may at any time Transfer all or any portion of his or its Membership Interests (A) to any other Member, (B) to the family of a Member who is a natural person which includes such Member's spouse, parents, children, grandchildren, siblings, a trust for the benefit of the aforesaid parties or a family partnership (including a limited liability company owned by family members) (a "**Member's Family**") and (C) to any Person with the prior written consent of the Managers which may be withheld in their sole discretion (each a "**Permitted Transferee of a Membership Interest**"). Notwithstanding Section 7.1, a holder of an Indirect Interest may at any time Transfer all or any portion of his or its Membership Interests to the family of a holder of an Indirect Interest who is a natural person (a "**Permitted Transferee of an Indirect Interest**" and collectively with a Permitted Transferee of a Membership Interest, a "**Permitted Transferee**"). A Permitted Transferee of a Membership Interest shall be admitted as a Member of the same class as the transferor only if (X) such Permitted Transferee of a Membership Interest agrees to be bound by the terms and conditions of this Agreement, (Y) such Permitted Transferee of a Membership Interest, if required by the Managers, provides an opinion of counsel satisfactory to the Managers that the Transfer to such Membership Interest does not violate any Federal or state securities or blue sky law, and (Z) in the case of a Permitted Transferee of a Membership Interest described in clause (C) above, the Managers consents to such admission which consent may be withheld in the Managers' sole discretion. Notwithstanding the foregoing, in no event may any Membership

43

Interests or Indirect Interests be Transferred to a Person who is a minor or incompetent and in no event may any equity interests in any family trust or family partnership (including an equity interest in a limited liability company) be Transferred to anyone other than a family member.

7.3   **Prohibited Transfer**

A.      Any purported Transfer of Membership Interests or Indirect Interests that are not effected in accordance with the provisions of this Agreement shall be null and void and of no effect whatever; provided that, if the Company is required to recognize a Transfer that is not a permitted Transfer (or if the Company in its sole discretion, elects to recognize a Transfer that is not a permitted Transfer), the holder of the Membership Interests Transferred shall be entitled only to receive allocations and distributions to which the former Member would have been entitled, and any distributions to which such Person may be entitled may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee or any such Membership Interests may have to the Company.  In any event, the recourse of the holder of the Membership Interests or Indirect Interests Transferred shall only be against the transferor of the Membership Interests or Indirect Interests not the Company, the Members or the Managers.  The Company and the Managers shall have no fiduciary duty to the holder of the Membership Interests Transferred unless such Person is admitted as a Member.

B.      In the case of a Transfer or attempted Transfer of Membership Interests or Indirect Interests that is not effected in accordance with the provisions of this Agreement, the parties engaging or attempting to engage in such  Transfer shall be liable to the Company and the other Members for and shall indemnify and hold harmless the Company and the other Members from, all costs, liabilities, and damages that any of such indemnified Persons may incur

US_ACTIVE-103768707.25

(including, without limitation, incremental tax liability and lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

C.    In the event any Membership Interests are Transferred in accordance with this Agreement, the transferee shall succeed to the Membership Interests, Capital Account and other relevant items of the transferor to the extent each relates to the Transferred Membership Interests.

**7.4    Pre-emptive Rights**

A.    The Members shall have a pre-emptive right of purchase with respect to any and all issuances of new Membership Interests, new equity securities, and/or rights to acquire or convert into the same of the Company ("**New Membership Interests**").    Subject to the limitations set forth in Section 6.3B if the Company shall at any time propose to issue any New Membership Interests, including with respect to Additional Capital Contributions for Operations and Capital Improvements pursuant to Section 3.1D and Section 3.1E, and in accordance with Section 3.1E, Section 3.1F and Section 6.3B(ix), it shall deliver to the Members a notice to that effect, which notice shall set forth the amount and class of New Membership Interests proposed to be issued, the proposed issuance price and the other terms of such proposed issuance.    During the period of ten (10) days following the date of such notice (the "**Subscription Period**"), the Members shall have the right to deliver to the Company an irrevocable notice (a "**Subscription Notice**") electing to purchase, at the proposed issuance price and pursuant to the same terms of purchase, some or all of the New Membership Interests (the New Membership Interests shall be allocated among the Members based upon the percentage of number of Membership Interests owned by each of them or in such other manner as they may mutually agree upon).    Subject to

45

US_ACTIVE-103768707.25